(C.D. 2189)

JOLEO IMPEX CO. *v.* UNITED STATES

United States Customs Court, First Division

(Decided July 5, 1960)

*John D. Rode* for the plaintiff.

*George Cochran Doub*, Assistant Attorney General (*Mollie Strum*, trial attorney), for the defendant.

Before OLIVER, MOLLISON, and WILSON, Judges; MOLLISON, J., concurring

WILSON, Judge: The merchandise under protest, invoiced as raw ostrich feathers, was assessed with duty at 20 per centum ad valorem under paragraph 1518 of the Tariff Act of 1930 as crude feathers. The importer claims that the goods in question are properly dutiable under paragraph 1518 of the act, as modified by the General Agreement on Tariffs and Trade, T.D. 51802, supplemented by T.D. 51909, at 10 per centum ad valorem, as "ostrich" feathers.

Three witnesses were called at the trial of the case, two by the plaintiff and one by the Government.

Fischel Rathaus, owner of the plaintiff company, stated that he had been in the importing and exporting business since 1941 (R. 5). He testified that he had handled merchandise such as that imported (plaintiff's illustrative exhibit 1) and that the importation in question came from Argentina. He further stated that his company purchases and sells such merchandise under the name of South American ostrich feathers, the sales being made for the most part in New York (R. 8–11), and that, in his opinion, the involved feathers are ostrich feathers (R. 11, 18).

On cross-examination, Mr. Rathaus, in response to questioning by Government counsel, stated that his company did not sell the mer-

chandise before the court as "vulture feathers," further stating that he did not know the name of the bird from which the imported merchandise was taken (R. 11–12). The witness stated that he had heard the name "rhea," and, when asked whether a rhea is different from an ostrich, responded "I think so" (R. 13). He admitted that he had never seen an ostrich of any type, not even in a zoo (R. 16).

A feather or plume, admittedly derived from the South African ostrich, was received in evidence as defendant's illustrative exhibit A (R. 14). Certain feathers, identified by Mr. Rathaus as South American feathers "from the same bird" as plaintiff's illustrative exhibit 1, were received in evidence as defendant's illustrative exhibit B (R. 15). Mr. Rathaus stated that while there are differences between plaintiff's illustrative exhibit 1 and defendant's illustrative exhibit A, yet, in his opinion, both exhibits are ostrich feathers (R. 18).

Plaintiff's second witness, Silvio Gaguine, testified that he had conducted a business under the name of Silvio Gaguine & Co. since 1920. He further stated that, since 1946 or 1947, his company has imported merchandise like plaintiff's illustrative exhibit 1 from Argentina (R. 22–23), and that, while in South America, he had seen thousands of rheas, which he stated were known in South America as nandus (R. 24). In his opinion, the imported feathers are "Ostrich feathers, South American ostrich feathers." (R. 23.) The witness further testified that feathers, such as plaintiff's illustrative exhibit 1 and defendant's illustrative exhibit B, have always been sold by his company as ostrich feathers (R. 25); that he had heard feathers, such as plaintiff's illustrative exhibit 1 and defendant's illustrative exhibit B, referred to as "vulture" feathers and that some of his customers referred to them under that name (R. 42). He stated, however, that he never billed such merchandise as "vulture feathers" and that he had never received orders in writing for "vulture feathers" (R. 43). While the witness noted certain differences between defendant's illustrative exhibits A and B, still he said that the difference in the quality of the feathers might be accounted for by the fact that the ostrich of South America is a degenerate type of ostrich (R. 44). Mr. Gaguine readily admitted, as did the other witnesses, that there are obvious differences in the feathers, represented by defendant's illustrative A, and those from South America, represented by defendant's illustrative exhibit B. This fact is indisputable as evidenced by an examination of the exhibits. Defendant's illustrative exhibit A is a large, full, soft, lustrous plume, while defendant's illustrative exhibit B and plaintiff's illustrative exhibit 1 are small feathers of poor quality without any substantial similarity to a real plume.

Maurice Sears, the only witness called by the defendant, testified that he has been in the business of importing and exporting feathers,

"that is ostrich feathers and fancy feathers," for over 50 years and that he had dealt in merchandise, such as plaintiff's illustrative exhibit 1, during that period, and that he had also seen the birds from which such feathers come in South America. This witness also testified that feathers, such as those imported, are bought and sold as "vulture feathers" (R. 57). It was agreed, however, between the parties that the term "vulture," as used above, has no reference whatever to the bird known by that name. He further stated that the feathers represented by defendant's illustrative exhibit A were bought and sold throughout the United States as ostrich feathers (R. 58), but that he had never heard of feathers, such as those in plaintiff's illustrative exhibit 1 and defendant's illustrative exhibit B, referred to as ostrich feathers. The witness emphasized the fact that the ostrich is much larger than the rhea and that it can eat twice as much, as being important differences between the two birds (R. 64). He stated that he had never seen the words "South American ostrich" or "American ostrich" in print and had never read about it, further testifying that he did not agree with the statement from the Encyclopedia Britannica, 1948 edition, volume 9, page 131, to the effect that feather brushes and dusters of superior quality, under the name of "vulture" dusters, are really made of American ostrich feathers. Mr. Sears stated emphatically that there is but one kind of ostrich feathers—feathers from the ostrich birds of South Africa (R. 73).

In substance, the testimony of the witnesses boils down to the fact that the witnesses for the plaintiff say that the South American rhea is an ostrich, and the feathers derived from that bird are ostrich feathers and are dealt in in this country as South American ostrich feathers. On the other hand, the witness for the defendant asserts that the imported feathers are known as "vulture feathers" in the United States market and are not ostrich feathers; that the only ostrich feathers are those derived from the South African ostrich.

Quite clearly, the court cannot resolve the question of whether the crude feathers constituting the imported merchandise are or are not ostrich feathers, as contemplated by the exception set forth in the proclamation revoking the modification of paragraph 1518, *supra*, from the testimony of the witnesses. The oral evidence is, in fact, opinion testimony rather than factual evidence. While the testimony will be a factor in determining the question presented, the evidence clearly is not conclusive, and the court must, therefore, look to other sources for aid in resolving the basic question as to whether or not the South American bird, known as the rhea, is or is not an ostrich for tariff purposes under the law as it stood at the time of the importation in question.

It is quite true, as contended by the plaintiff, that the essential facts in the case at bar are not in dispute, for it is admitted on both sides that the imported feathers are derived from the South American bird known as the rhea or nandu. Neither can it be denied that the rhea is frequently referred to as the South American or American ostrich. An examination of the exhibits also demonstrates beyond doubt that rhea feathers (plaintiff's illustrative exhibit 1 and defendant's illustrative exhibit B) are greatly inferior in appearance, size, and quality to African ostrich feathers (defendant's illustrative exhibit A). There is, in fact, no substantial resemblance between the two kinds of feathers. The evidence also warrants the finding that rhea feathers now are and for many years last past have been sold in the commerce of the United States as South American and American ostrich feathers, but are sometimes referred to as vulture feathers.

The real controversy between the parties arises from the fact that the trade agreement modifying paragraph 1518, *supra*, reducing the duty on crude feathers from 20 per centum ad valorem to 10 per centum ad valorem (T.D. 51802) was terminated by Presidential proclamation, T.D. 52587, 85 Treas. Dec. 295, as to all crude feathers except "ostrich" feathers. The rate of duty as fixed in paragraph 1518, *supra* (20 per centum), was thereupon restored as to all crude feathers except ostrich feathers. The sole issue between the parties, therefore, really is: Are the feathers now under consideration by the court (admittedly feathers obtained from the rhea bird of South America) ostrich feathers? If they are, the protest should be sustained.

It is well. settled that an exception which carves out of a statute something ordinarily included within the purview must be strictly construed. *Goat and Sheepskin Import Co. et al.* v. *United States*, 5 Ct. Cust. Appls. 178, 180, T.D. 34254. Accordingly, the exception to "ostrich feathers" from the *termination* of the reduction of rates applicable to crude feathers (T.D. 52587) should be strictly construed. In the case at bar, the exception granted to ostrich feathers under Presidential proclamation, T.D. 52587, *supra*, from the termination of the reduction of the rate of duty applicable to crude feathers, which tariff reduction was provided for in the General Agreement on Tariffs and Trade, T.D. 51802, applies only to such crude feathers as were considered "ostrich feathers" within the intent of Congress.

In determining whether the (specific) exception in the Presidential proclamation (T.D. 52587) as to "ostrich feathers" was intended under congressional authority to embrace ostrich feathers from the Union of South Africa and not the imported rhea feathers from Argentina,

we deem pertinent the following information, as disclosed in the following document:

General Agreement
on Tariffs and Trade
Schedule XX
United States of America
Annotated to show Countries
with which Concessions were
Initially Negotiated at Geneva
in 1947
U.S. Government Printing Office
3502—State—1949
PART I

[at page 146]

| Tariff Act of 1930, paragraph | Description of Articles | Rate of Duty | Country with which rate was initially negotiated |
|---|---|---|---|
| 1518 | Feathers and down, on the skin or otherwise: Crude or not dressed, colored, or otherwise advanced or manufactured in any manner, not specially provided for_____ | 10% ad val. | (1) |

[1] Entire item, China; ostrich feathers only, So. Africa.

It would appear from the above document that the tariff concessions provided for in the General Agreement on Tariffs and Trade, T.D. 51802, with respect to paragraph 1518 covering "Feathers and downs, on the skin or otherwise:  Crude or not dressed, * * *," with a duty reduction from 20 per centum to 10 per centum ad valorem, was initially negotiated with China for the entire items, but that the concession with respect to "ostrich feathers" was initially negotiated only with South Africa.  The aforesaid document was referred to by our appellate court in *George E. Bardwil & Sons* v. *United States*, 42 C.C.P.A. (Customs) 118, C.A.D. 583, in determining the proper rate of duty applicable to certain cotton and flax articles.  The involved merchandise was assessed with duty at the rate of 90 per centum ad valorem under paragraph 1529(a) of the Tariff Act of 1930 and claimed properly dutiable at 70 per centum ad valorem under said paragraph of the act, as modified by the General Agreement on Tariffs and Trade, T.D. 51802.  The question there for determination was whether the modification of said paragraph 1529(a), *supra*, made

effective by the General Agreement on Tariffs and Trade, *supra*, was terminated, insofar as the involved merchandise was concerned, by Presidential Proclamation No. 2908, T.D. 52587, the same proclamation here under consideration. Plaintiff, in the *Bardwil* case, *supra*, contended that, because concessions were made effective before the Republic of China signed the so-called protocol of provisional application and such concessions were not withheld under article XXVII of the said General Agreement on Tariffs and Trade, *supra* ["Any contracting party shall at any time be free to withhold or *to withdraw* in whole or in part any concession, provided for in the appropriate Schedule annexed to this Agreement, in respect of which such contracting party determines that it was *initially negotiated* with a government which has not become, or *has ceased to be, a contracting party.* * * *"] [italics supplied], said Presidential proclamation 2908 was null and void and of no effect, insofar as the merchandise there involved was concerned. In its decision, our appellate court, in the *Bardwil* case, at pages 124–125, stated:

* * * there is no doubt that the Republic of China was one of the original nations which negotiated generally with respect to the General Agreement on Tariffs and Trade. (See the Final Act of the General Agreement on Tariffs and Trade, *supra*.) Notwithstanding the fact that the Republic of China had not yet become a contracting party to the General Agreement on January 1, 1948, the date it went into effect, the Republic of China did become a contracting party on May 22, 1948 by signing the Protocol of Provisional Application on April 21, 1948 in accordance with paragraph 4 thereof, *supra*. Thus in view of the above stated facts, the Republic of China, which was only a negotiating party relative to the General Agreement on January 1, 1948, became a contracting party to said General Agreement subsequent to this date, namely, on May 22, 1948, by virtue of its compliance with paragraph 4 of the Protocol of Provisional Application. That the Republic of China did become a contracting party, and was considered such by the United States, is stated in paragraph 5 of T.D. 51909, *supra*. Thus it can be seen that the Republic of China was both a negotiating party and a contracting party with respect to the General Agreement, and therefore a contracting party within the meaning of Article XXVII. The answer to question (1), *supra*, must therefore be in the affirmative.

Relative to question (2), *supra*, it remains to be ascertained whether the specific concession, "paragraph 1529(a)—twelfth," was initially negotiated with the Republic of China, which ceased to be a contracting party. If this concession was *initially negotiated* with the Republic of China, a *contracting party* to said General Agreement, then all of the conditions necessary for the withdrawal of the concession by the United States under Article XXVII, *supra*, have been met. [Italics quoted.]

It appears that when the Presidential proclamation in T.D. 52587, *supra*, was issued, it was clearly the intention of the provisions to terminate certain concessions provided for in the General Agreement on Tariffs and Trade, T.D. 51802, which were *initially* negotiated with the Republic of China, which was a contracting party to the General Agreement on Tariffs and Trade (T.D. 51909, *supra*). As heretofore indicated, the tariff concession in the said general agreement with

respect to paragraph 1518 covering "Feathers and downs * * * Crude or not dressed," was initially negotiated with China for the entire item. Accordingly, in view of the fact that the modification reducing the rate of duty on the importation of "ostrich feathers" was initially negotiated with the Union of South Africa, and since ostrich feathers were specifically exempted from the terminating provisions of Presidential proclamation, T.D. 52587, respecting paragraph 1518 of the tariff act, thus permitting continuance of the reduced rate as provided for in the General Agreement on Tariffs and Trade with respect to the importation of ostrich feathers, this evidences, in our opinion, a congressional intent to apply the exception to the terminating provisions of T.D. 52587, *supra*, only to ostrich feathers from South Africa and not to other classes of feathers from other countries, specifically, not to the rhea feathers here imported from Argentina, and supports a conclusion that the tariff terminology "ostrich feathers" refers only to ostrich feathers indigenous to South Africa. By virtue of such restricted exception, the imported crude feathers are not entitled to the reduced rate of duty here claimed.

Further confirming the conclusion, in our opinion, that the feathers of the rhea bird are not "ostrich" feathers tariff-wise, is the fact that, for a great many years, customs officials have considered the so-called South American ostrich, or rhea, not to be an "ostrich" and have issued directives relative to the nonimportation of the plumage of the rhea species. In a directive, issued under date of November 9, 1914, addressed to the collector of customs at New York, relative to paragraph 347 of the Tariff Act of 1913, respecting the importation of certain plumes and feathers of wild birds, the Assistant Secretary of the Treasury advised that shipments of the plumage of the rhea bird should be refused, unless shown to have been actually shipped prior to the date of said instructions, "As further investigation by the department has shown that the rhea is not properly classified as an ostrich, but is in fact a wild bird * * *" (T.D. 34886, 27 Treas. Dec. 397). Paragraph 1419 of the Tariff Act of 1922, covering "Feathers and downs, * * * crude or not dressed, * * *," as did predecessor paragraph 347 of the 1913 act, also contained a prohibition against the importation of the plumage of wild birds, but excepting the "feathers or plumes of ostriches." Paragraph 1518 of the present act contains language to the same effect. Consistent with the foregoing directive of the department in T.D. 34886, *supra*, we find, in the Customs Regulations of 1943, section 12.29(c), page CR–260, the following:

(c) As the plumage of certain species of birds, viz, the rhea, * * * may be obtained from either wild or domesticated birds, such plumage shall be admitted only upon the presentation of satisfactory evidence that it was in fact taken from domesticated birds. * * *

Substantially the same language as that noted above may be found in the Customs Regulations of 1943, as amended (section 12.29(c)), T.D. 52469, 85 Treas. Dec. 127, 130. It would appear from all of the above that the ostrich and the rhea have been constantly treated as different birds for customs purposes. This long-continued practice should be given prime consideration in our determination of the proper rate of duty applicable to the imported merchandise. As stated by our Supreme Court in *Komada* v. *United States*, 215 U.S. 392, 396, 19 Treas. Dec. 13, 14, T.D. 30253:

* * * the construction given by the Department charged with the execution of the tariff acts is entitled to great weight. As said by Mr. Justice McKenna, delivering the opinion of the court in *United States* v. *Cerecedo Hermanos y Compañia* (209 U.S., 337, 339; T.D. 28954):

We have said that when the meaning of a statute is doubtful great weight should be given to the construction placed upon it by the Department charged with its execution. * * * And we have decided that *the reenactment by Congress, without change, of a statute which had previously received long-continued executive construction is an adoption by Congress of such construction. United States* v. *Falk* (204 U.S., 143, 152; T.D. 27832). [Italics ours.]

Long-continued and well-established tariff status of an article should not be disturbed "unless required by legislative authority plainly expressed." *United States* v. *Bernard, Judae & Co.*, 13 Ct. Cust. Appls. 444, 450, T.D. 41346. There is nothing in the present case to indicate a legislative intent contrary to the determinations, heretofore expressed by the customs authorities, respecting the difference tariff-wise between the rhea bird or the plumage of that species and ostriches and "ostrich feathers."

Congress, in recent legislation, has again indicated that, for tariff purposes, ostriches and "rheas" are not the same. In Public Law 580, enacted July 17, 1952, 66 Stat. 755, amending paragraphs 1518 and 1535 of the Tariff Act of 1930 to require permits for the importation of the feathers of certain birds, we find, with respect to paragraph 1518, the following:

(c) Subparagraph (b) shall not apply—
(1) in respect of any of the following birds (* * *): chickens (* * *), turkeys, * * * *ostriches*, rheas, English ring-necked pheasants, and pea fowl; * * *. [T. D. 53066, 87 Treas. Dec., pages 233–234.] [Italics ours.]

It would appear from the above that Congress, in its legislation on the aforesaid subject matter, took cognizance of the fact that the birds referred to in T.D. 53066, *supra*, were different from each other and, accordingly, used and mentioned different names in order to have them covered by the pertinent legislation and, in so doing, made a legislative differentiation between "ostriches" and rheas. If the latter two birds were the same for tariff purposes, it would appear unnecessary to have designated them separately in order to effect the legisla-

tive intent. A distinction once made by Congress as to tariff commodities will be presumed to continue in the absence of anything showing a contrary legislative intention. *United States* v. *Davies Co.,* 11 Ct. Cust. Appls. 392, T.D. 39317. Accordingly, when the President, in the terminating proclamation, T.D. 52587, employed the words [all articles except] "ostrich" feathers and not rhea [feathers] in the exception therein, it was clearly the intention by such limited use of language to confine the exception to ostriches and not to include rheas, which, as heretofore indicated, are different in species. The master rule in the construction of statutes is to so interpret them as to carry out the legislative intent. *Procter & Gamble Manufacturing Co.* v. *United States,* 19 C.C.P.A. (Customs) 415, 418, T.D. 45578.

While there is testimony to the effect that the imported rhea feathers are sometimes referred to in the country of origin as South American ostrich feathers, such characterization does not make these articles "ostrich feathers" for tariff purposes. *Cf. Terrazzo & Marble Supply Co., Inc.* v. *United States,* 30 Cust. Ct. 202, 209, C.D. 1521; *United States* v. *Walter et al.,* 4 Ct. Cust. Appls. 95, T.D. 33371. On the other hand, it is undisputed, as disclosed by the testimony of the witnesses herein, that ostrich feathers from the ostrich bird in South Africa are definitely "ostrich feathers," both commonly and commercially so known, and for tariff purposes. The fact that there exists certain similarities between the ostrich and the rhea bird does not preclude a finding, based on tariff considerations of the two items and authoritative sources, that the two are different.

In the Encyclopaedia Britannica, 1948 edition, volume 9, under the heading "Feathers," at page 131, under the subheading "Ornamental feathers," we find the following statements:

* * * Ostrich farming is one of the established industries of South Africa, and is also practised in North Africa, Argentina, Arizona and California. * * *

In addition to those of the ostrich, the feathers of certain other birds form articles of steady commercial demand. Among these are the feathers of the South American ostrich. *Rhea americana* * * *.

In Webster's International Dictionary, second edition 1956, at page 1728, we find:

ostrich * * * a A ratite bird of the genus *Struthio*; esp. * * * of arid parts of northern Africa, the largest of existing birds, * * *. The ostrich * * * of southern Africa and that * * * of eastern Africa are regarded as distinct subspecies. b By extension, a rhea.

Funk & Wagnalls New Standard Dictionary (1942), page 2106, defines "rhea" as follows:

An ostrich-like rheoid bird of the plains of South America, having three toes * * *. These "American ostriches" have much the same manners as the *true* ostriches, but are smaller, more fully feathered * * *. [Italics ours.]

The foregoing authorities would seem to indicate that the rhea species is not a true ostrich even within the common acceptation of the term.

For all the reasons stated aforesaid, we are of opinion and hold that the involved merchandise is properly dutiable under paragraph 1518 of the Tariff Act of 1930 at the rate of 20 per centum ad valorem under the provisions of said paragraph for "Feathers and downs, * * * crude or not dressed, * * * not specially provided for." The protest herein is overruled.

Judgment will be entered accordingly.

### CONCURRING OPINION

MOLLISON, Judge: In noting my concurrence in the conclusion reached by my colleagues in this case that the common meaning of the term "ostrich feathers," as used in the Presidential proclamation reported in T.D. 52587, does not include rhea feathers, I wish to note also my dissent from that portion of the opinion of my colleagues which holds that the exception to the terminating provisions of T.D. 52587 applies only to ostrich feathers from South Africa.

I am of the opinion that the exception relates only to ostrich feathers *of the kind* produced in South Africa and applies to such feathers no matter from whence imported, within, of course, the limitations of the generalization provisions of the Trade Agreements Act. The fact that the trade agreement concession in the general agreement with respect to ostrich feathers was initially negotiated with the Union of South Africa might be considered some sort of argument that the negotiators for the countries concerned in the general agreement had that kind of feather in mind when they included ostrich feathers among those which were given the benefit of tariff reduction in the general agreement. However, I do not consider such an argument to be persuasive, in view of the fact that it is based entirely upon inference as to the state of mind of the negotiators with absolutely nothing to show the actual fact.

I, therefore, prefer to base my concurrence solely upon the determination, as matter of law, of the common meaning of the term "ostrich feathers."