(C.D. 2525)

A. ZERKOWITZ & CO., INC. *v.* UNITED STATES

United States Customs Court, First Division

(Decided on rehearing [Abstract 66043] April 7, 1965)

*James G. McGoldrick* (*James G. McGoldrick* and *Jerome M. Lynes* of counsel) for the plaintiff.
*John W. Douglas*, Assistant Attorney General (*Richard E. FitzGibbon*, *Harold L. Grossman*, and *Samuel D. Spector*, trial attorneys), for the defendant.

Before WILSON and NICHOLS, Judges; OLIVER, C.J., not participating

NICHOLS, Judge: This case is a rehearing of *A. Zerkowitz & Co., Inc.* v. *United States*, 47 Cust. Ct. 302, Abstract 66043, pursuant to an order granted on November 20, 1961; *A. Zerkowitz & Co., Inc.* v. *United States*, 47 Cust. Ct. 381, Abstract 66226. Since the reopening of the case, additional testimony has been taken, further exhibits introduced, and certain facts stipulated.

The merchandise consists of footwear with cotton canvas uppers, rubber soles, and leather tongues, in chief value of leather. Two types are involved: One described as tennis oxfords or low-cut sneakers, and the other as basketball shoes or high-cut sneakers. The sizes of the former range from 5 in the small or first series through 10½ in the large series, and those of the latter from 8½ through 11 in the small

series. (As stated in the original decision in this case, in the United States, there are two series of footwear sizes, running from 1 to 13 in the small, or first, series, and from 1 to 13 and larger in the second series.) The collector classified the merchandise in controversy at 20 per centum ad valorem under paragraph 1530 (e) of the Tariff Act of 1930 as footwear in chief value of leather. It is claimed to be properly dutiable at 10 per centum ad valorem under said paragraph, as modified by the Torquay Protocol to the General Agreement on Tariffs and Trade, T.D. 52739, as men's, youths', or boys' footwear.

The pertinent provisions of the tariff act are as follows:

PAR. 1530. * * *

\* \* \* \* \* \* \*

(e) Boots, shoes, or other footwear (including athletic or sporting boots and shoes), made wholly or in chief value of leather, not specially provided for, 20 per centum ad valorem; * * *.

PAR. 1530 (e) [as modified by the Torquay Protocol to the General Agreement on Tariffs and Trade, T.D. 52739]. Boots, shoes, or other footwear (including athletic or sporting boots and shoes), made wholly or in chief value of leather, not specially provided for:

\* \* \* \* \* \* \*

Other, if men's, youths', or boys' * * *_____ 10% ad val.

The Congress has acted to discourage the use of an avoidance device such as is here involved by amendments to paragraph 1530(e), not applicable to the instant importations.

Plaintiff contends that the words "if men's, youths', or boys' " in the tariff modification constitute a descriptive provision covering shoes made either in a male style or on a male last and that the imported articles are made in a male style or last and are, therefore, within the said modification. Its view is that the question before the court is whether the imported shoes are made on a male or female last. Defendant claims that the tariff term refers to the use of the footwear and not how it is made and that the chief use of the imported shoes, or at least the tennis oxfords, was not by men or boys. Defendant has conceded that basketball shoes in the size represented by plaintiff's exhibit 7 (size 8½ in the second series), is a boys' basketball shoe, but has made no concession that all basketball shoes are shoes for boys.

In the original decision herein, the late Judge Mollison held that without some recognized standard of measurements of male lasts of a given size, the evidence presented was insufficient to establish that the imported tennis shoe was made on a male last. He also stated that the evidence suggested that some lasts, particularly those for tennis oxfords, were made so that the shoes could be used and were used by members of both sexes. He found, as to the basketball shoes, that the evidence did not establish that the exhibits were representative of the

imported shoes or that the testimony given was applicable to them. The protests were, therefore, overruled.

It is stated in the opinion (p. 302) :

Further, there seems to be no question but that footwear of the type here in issue is made on lasts, which are blocks or forms shaped like feet, with the use of which shoes and other footwear are made.

Both parties are in agreement that the term "men's, youths', or boys'," as used in the trade agreement modification of paragraph 1530(e), *supra*, refers to members of the male sex.

It has also been stipulated that there are male and female lasts used to make tennis shoes, but defendant contends that the same lasts are used for men's and women's shoes so far as sneakers are concerned.

In clarification of the former opinion, it should be added that neither at the original trial nor on rehearing was more established than that domestic footwear of the type here involved was made on male and female lasts. The imported footwear is of Hong Kong and Japanese origin, and no evidence or stipulation was offered or received as to how it was made. Should we assume it was made on lasts, there was no evidence or stipulation showing whether the foreign producers recognize or observe any distinction between male and female lasts, or whether the merchandise involved, or any part thereof, was ordered, purchased, sold, delivered, or invoiced as products of male or female lasts. The former opinion refers, at page 306, to a witness who made "the last of the imported shoe," but this was from a cast taken from a sample, not a last actually used in production. The witness, though a lastmaker, did not claim to have made lasts for use in Hong Kong or Japanese production.

Plaintiff, in its motion for rehearing, alleged it could produce evidence to establish that the footwear involved was made on male lasts. However, interrogatories to a witness in Japan produced nothing that has been offered in evidence. A subpoena served on a domestic rubber footwear company eventuated only in a stipulation which aids us but little. Domestic industries should realize that subpoenas to furnish evidence to this court do not call on them to aid one or the other party, but to aid the court. The court cannot do its work without evidence. Those who benefit from the protective tariff should be the most zealous to aid in the administration of justice under the tariff act. We proceed to the evidence as actually supplemented in the rehearing.

For the purposes of this opinion, we will consider first the evidence presented in regard to the tennis oxfords or low-cut sneakers. Samples of these articles were received in evidence as plaintiff's exhibits 1, 2, 3, 4, 5, and 6. It was stipulated that they represented the imported articles as to shape, design, last, and material, and that they were similar in all respects, except for size. They have rounded toes with

extra bumpers on the toes and have comparatively heavy or thick rubber soles, while the uppers are of canvas. They range in size from size 13 in the small series (exhibit 6) to size 10 in the second series (exhibit 2). Exhibits 1, 2, and 4 have white uppers, exhibit 3 has a blue upper, exhibit 5 a red upper, and exhibit 6 a black upper. Exhibits 1 through 5 have ridged soles, whereas exhibit 6 has a pebbled sole. The soles are of grey rubber, except for exhibit 6, which is black.

The witnesses who testified at the original trial and at the rehearing included shoe retailers, wholesalers, and buyers, and a bootmaker. They did not entirely agree as to whether these shoes are sold to and used by males or females or both, but the preponderance of the evidence indicates that they are sold to and used by both. One witness testified that he sells such merchandise in his three retail stores where he sells ladies' and children's shoes but none for males over size 6. Others said that these shoes are sold to and worn by both men and women or boys and girls. Two said that exhibits 3, 4, 5, and 6 are sold to both boys and girls, although they thought exhibit 2 was a male shoe. Two witnesses said that these shoes are sold mostly to girls, particularly the red shoe, since red is predominantly a female color. One said that in these sizes boys preferred a high shoe and not an oxford. Three who stated that exhibit 2 was a man's shoe gave as a reason that it had a broad toe, a broad last, a heavier ridged sole, and a bumper on the toe. One admitted, however, that it could be worn by both men and women, and another testified that exhibits 3, 4, 5, and 6 were sold to and used by both male and female.

Two of plaintiff's witnesses testified that the trade distinguishes between a male and female shoe by style mostly and also by the last. Plaintiff's third witness, the custom boot and shoemaker, had made plaster molds and wooden lasts from three tennis oxfords, one in men's size 7, another in women's size 7, and the third of a shoe similar to plaintiff's exhibit 1, also in size 7. (Plaintiff's exhibits 10–18.) Last measurements are made at the ball, waist, instep, length, and width of the last. The definitions of these terms were stipulated by counsel to be as follows:

* * * the ball measurement is a line running completely around the last intersecting the joints of the large and small toes. The waist measurement is a line running completely around the last approximately one inch in back of the ball measurement halfway between the cone and the base of the last. The instep measurement is a line running completely around the last approximately one inch in back of the waist measurement halfway between the cone and the base of the last. The length measurement is a straight line running from the forward end of the toe to the rear of the heel. The width measurement is a straight line running across the bottom of the last measured at the ball or the widest part of the foot.

These measurements, as testified by the witness and checked by the court, are:

| Measurement | Ex. 12 (men's domestic) | Ex. 15 (women's domestic) | Ex. 18 (imported) |
|---|---|---|---|
| Ball | 8¼ | 7⅜ | 8 |
| Waist | 8¾ | 7⅞ | 8⅝ |
| Instep | 9 | 8½ | 9 |
| Length | 10½ | 10 | 10⅛ |
| Width | 3⅜ | 3 | 3¼ |

In the original decision in this case, Judge Mollison stated (pp. 305–306):

While there is some testimony to the effect that one-eighth of an inch does not make any difference in the measurement of a last for the determination of shoe characteristics, we are of the opinion that the discrepancies between most of the measurements of the last made with the use of the imported shoe and of the last made with the use of the domestic male shoe are too large for us to conclude that the imported shoe was made on a male last. There is evidence that lasts vary from manufacturer to manufacturer and between those made by the same manufacturer for different styles of shoes. It would seem that, unless there was some recognized standard of measurements of male lasts of a given size to which reference might be had, it would be necessary to show the measurements of a sufficient number of lasts identified as male lasts of the size and style in question to reasonably conclude the ranges of measurements which should be found in a male last.

To meet these objections, plaintiff has introduced into evidence as plaintiff's exhibit 26, "Standard Last Measurements," published as a supplement to the Shoe and Leather Reporter, October 14, 1886. The parties have stipulated that exhibit 26 sets forth generally recognized standard last measurements; that these measurements are consulted currently as guides by manufacturers of all types and styles of footwear; that when a manufacturer does not produce on a standard last, he is said to have modified it; that manufacturers of sneakers do not make such products in all standard widths; and that they are made on lasts which are modifications of the standard.

In the stipulation referring to the products of the United States Rubber Co., it is stated:

11. Where two lasts, either of wood or of metal, are of the same footwear size, say size 7, and of the same basic style, say oxford, but of different gender, the last measurements will be different. The men's size 7 would have larger measurements than the woman's size 7.

＊ ＊ ＊ ＊ ＊ ＊ ＊

15. During 1957, 1958 and 1959 sneakers, both oxfords and high-cut, were generally made in three widths. These were: Narrow, Medium and Wide.

It was also stipulated that the United States Rubber Co. made most of the footwear lasts required to produce its sneakers; that such lasts were made of metal because metal will withstand the intense heat of

the vulcanizing operation better; and that when a last is produced in one size, other sizes are made by machines which reproduce graded-up or graded-down lasts with the same characteristics and gender as the model lasts. Whether the lasts for the imported shoes were produced in this fashion does not appear, if lasts were used.

According to exhibit 26, the last measurements of ball, waist, instep, and length are the same for men's and women's shoes of the same size. Some of the widths for men's shoes are larger. It does not appear, therefore, that it can be determined from last measurements alone that a particular last is for a male or a female shoe.

Furthermore, in the instant case, none of the lasts made by the last-maker witness corresponds to the standard measurements. The measurements of the imported shoe fall between those of the domestic male shoe and the domestic female shoe, except in one instance. It is possible to conclude that such shoe was intended for both men and women, especially since there is no evidence that the foreign manufacturer produces different tennis oxfords for males and females.

As to basketball shoes, plaintiff has introduced into evidence exhibit 7, which was conceded to be a boy's shoe. It is a black, high-top sneaker with white trim in size 8½ in the large series. It has a heavy treaded sole, a rounded toe with a heavy bumper, and a rubber protective piece on the top of the toe. There was also received in evidence, a white, high-top sneaker, with a heavy suction sole, and arch support, in size 3, second series. No samples were produced in the sizes here at issue, 8½ to 11 in the small series. The only evidence connecting these sizes with the exhibits are statements that such shoes in all sizes are basketball shoes for males. There is also testimony that there may be basketball sneakers for girls and a contradictory statement that women do not use high-top basketball shoes, but wear low-cut shoes.

The situation of the "basketball shoe" is different so far as the term implies that the shoe is designed for a sport more commonly indulged in by males. The Government concedes that the larger sizes, as typified by samples before the court, are male shoes. They are of heavier construction than the oxfords. The smaller children's sizes are not illustrated by samples, but are alleged to be the same as the larger, except as to size. However, the facts of record cannot be held to establish that because exhibits 7 and 9 are boys' basketball shoes, high-cut sneakers in other sizes are necessarily male, or that the imported high-cut sneakers were, in fact, the same as exhibits 7 and 9, except for size. In this connection, it is to be noted that the general sales manager of the United States Rubber Co., Footwear Division, testified that his firm makes "bals" or high-top shoes in sizes

8 to 12 (small series) for little boys, but begins to make basketball shoes only at size 11. In fact, the classification in the instant case appears to have been based on appraisers' memoranda to the effect that shoes in sizes 11 or smaller are in "little gents'" or "children's" sizes and do not come within the purview of men's, youths', or boys' shoes. (See memoranda attached to protest Nos. 60/20970; 60/20974.)

Several of the witnesses testified that certain sizes were men's, youths', or boys' and several of the exhibits list size ranges. The evidence presented is conflicting, and the witnesses stated that size ranges are indefinite and vary with the manufacturer. The following ranges were given by different witnesses for youths' sizes:

12 to 9, 9 to 12, 12 to 3, 12½ to 3, 11 to 2.
8½ to 3, 11 to 2, 10 to 3.
11 to 2.
11½ to 2.

Boys' and men's sizes are larger. There is also a size known as "little gents'," ranging from small size 8 to small size 11.

The foregoing indicates that plaintiff has failed to establish that the shoes are made on male lasts. We add that Judge Mollison's opinion was not intended to hold that the contested language means shoes made on male lasts, nor do we so hold.

The tariff description here involved first appeared in the trade agreement with Mexico, T.D. 50797. In the Digest of Trade Data, issued in connection with the agreement, it is stated:

Men's, youths', and boys' shoes or other footwear covered by the agreement consist chiefly of men's work shoes made by "wood or metal fastened" (wooden peg, standard screw, and nailed) and "stitchdown" methods of construction. These shoes are generally made with uppers of heavy cattlehide leather and with thick outer soles of leather. They are sold at retail in the medium- and low-priced fields and are worn chiefly by policemen, letter-carriers, laborers, and farmers. Imports from Mexico consist almost entirely of men's work shoes with nailed soles, worn by Mexican laborers working in Texas.

Publications of the Tariff Commission include in the listing of the rates applicable to boots, shoes, and other footwear, wholly or in chief value of leather, under paragraph 1530(e), as modified, the following:

Other:
 Men's, youths', or boys'_____ * * * 10% ad val.
 *   *    *    *    *    *    *
 For other persons_____ * * * 20% ad val.
            [United States Imports Duties (1950)]
Other:
 Boys', men's, or youths'_____ * * * 10% ad val.
 For other persons_____ * * * 20% ad val.
            [United States Import Duties (1952)]
            [United States Import Duties (1958)]

The provision for a 10 per centum rate for men's, youths', or boys' footwear is an exception carved out of a general rule. As such, by well-known principles, it must be strictly construed. *Goat and Sheepskin Import Co. et al.* v. *United States*, 5 Ct. Cust. Appls. 178, 180, T.D. 34254; *Joleo Impex Co.* v. *United States*, 45 Cust. Ct. 6, 10, C.D. 2189. In the latter case, the principle was applied by the first division in an opinion by Wilson, J., holding that the exclusion of "ostrich feathers" from the *termination* of a trade agreement concession on "crude feathers" did not apply to feathers of the South American rhea, sometimes, but loosely, referred to as an ostrich.

There is nothing before us to show that the trade agreement negotiators (who exercised delegated legislative authority in formulating the language to be construed) had in mind that the term "footwear— men's, youths', or boys' " meant shoes made on male lasts. There is evidence (e.g., exhibit 22) that the terms "men's," "youths'," and "boys' " all had meaning to those who dealt in shoes. But plaintiff expressly waived any reliance on commercial designation. The Shoe and Leather Lexicon was in part received as plaintiff's exhibit 23 for identification. We take judicial notice of the remainder. Under the heading, "Shoe Classification," page 100, 1952 edition, it is stated that classification of a shoe as men's, boys', youths' is "with reference to the wearer, connected partly with the sizes." This would seem to substantiate the Government's contention that we are concerned with a classification by chief use. The lexicon makes no reference to lasts in connection with shoe classification.

It is easy to see how the ambiguity herein arose. Often, if not usually, items worn on the body are so different, according to which sex they are meant for, that no one would willingly put on an item appropriate to the other sex. This is above all true of leather footwear. The trade agreement negotiators had in mind certain items indubitably masculine. They could not have foreseen that footwear in chief value of leather would include shoes with canvas uppers and rubber soles, merely because they had leather tongues. Thus, the fact, as shown by some evidence herein, that such footwear, even if made on male lasts, might be used indifferently by males and females, was left quite unprovided for. In common speech, there is no ambiguity about a reference to a man's hat or a woman's underwear, but with respect to sneakers the case is different.

It is not shown that consumers of sneakers know anything about lasts. It may be, as one witness said, if a woman wears a sneaker made on a male last, she is not wearing a fitted shoe. But does she know this? The canvas upper differs from a leather upper in that it adjusts more readily to the shape of the foot, without careful fitting.

There is nothing stamped or embossed on the shoes themselves (exhibits 1–6) to show what last they are made from. The evidence shows a woman wearing a sneaker made with a male last might have to take a half size smaller than she was used to, say 6½ instead of 7, but most retail buyers of footwear try it on anyway, as they have learned to pay little regard to the maker's alleged sizes, and the trade agrees with the consumer in wanting shoes to be selected by actual trial. Indeed, retail sellers frequently conceal the sizes. See definition "French Size Marking" in exhibit 23, page 36. A "French Size Marking" is simply one that is coded so the consumer will not understand it. Thus, alleged size would be of little importance to the customer, particularly in a shoe known to be imported. Apart from size, differences between male and female lasts do not reflect differences in natural foot contours so much as, in the female lasts, differences in female taste, as, e.g., pointed toes, but many females apparently prefer the more natural contour of the male last for sport and outdoor activity, when buying sneakers. Under the circumstances, we cannot hold it established that, *in common speech*, being made on a male last requires an item of rubber-soled, canvas upper footwear to be known as "footwear—men's, youths', or boys'." Hence, even if plaintiff had established beyond doubt that the imports herein were produced on male lasts, this would not be, we now hold, conclusive.

While plaintiff claims that these shoes are in a male style and are, therefore, classifiable as men's, youths', or boys' footwear, the evidence does not establish that they have physical characteristics or styling which would identify them as male. Although shoes with more pointed toes than those involved here might be recognized as female, there is no evidence that those with more rounded toes, such as those of exhibits 1 through 6, are strictly male and are not intended for or worn by women, especially for casual or sportswear.

The papers in several entries reflect that customs officers classified these shoes as they did because of a supposed established practice of classifying by chief use. It has generally been the position of Government counsel that chief use is the test. If they are right, the evidence would not enable us to overturn the collector's classification because chief use, whether by males or females, has not been satisfactorily established. The Government's test would seem to be at least as favorable a one as plaintiff is entitled to, and if any error of law was made in applying the chief use standard, it was not one by which plaintiff is aggrieved.

For the reasons stated, the protests are overruled as to both classes of footwear involved herein. Judgment will be rendered accordingly.