(C.D. 4513)

SELECTILE CO., INC. *v.* UNITED STATES

Court No. 68/48202

(Decided April 12, 1974)

*Glad, Tuttle & White* (*Edward N. Glad* of counsel) for the plaintiff.
*Carla A. Hills,* Assistant Attorney General (*David A. Ast* and *Bernard J. Babb,* trial attorneys), for the defendant.

RAO, Judge: The merchandise involved in this case consists of quirk mitered polished marble pieces, 1'0" x 1'0" x ⅜". It was assessed with duty at 21 per centum ad valorem under item 514.81, Tariff Schedules of the United States, as marble articles, other than slabs. It is claimed to be dutiable at 7 per centum ad valorem under item 514.65, as slabs, rubbed or polished in whole or in part.

The pertinent provisions of the tariff schedules are as follows: Schedule 5, part 1:

Subpart C. – Stone and Stone Products

Subpart C headnotes:

\* \* \* \* \* \* \*

2. The term "slabs" (items 514.61 and 514.65) embraces flat stone pieces, not over 2 inches in thickness, having a facial area of 4 square inches or more, whether or not cut to size and whether or not one or both surfaces have been rubbed or polished, the edges of which have not been beveled, rounded or otherwise processed except such processing as may be needed to facilitate installation as tiling or veneering in building construction.

\* \* \* \* \* \* \*

Marble, breccia, and onyx, and articles of one or more of these substances:

\* \* \* \* \* \* \*

Slabs:

\* \* \* \* \* \* \*

| | | | |
|---|---|---|---|
| 514.65 | Rubbed or polish in whole or in part | 7% | ad val. |
| 514.81 | Other, not specially provided for | 21% | ad val. |

The record presented consists of the testimony of two witnesses and three exhibits.

Plaintiff's witness was Robert Clarke, estimator, draftsman, and supervisor for Selectile Co., Inc., which is in the business of installing

tile and marble. He had been with that firm for 6 years and had previously been employed by other firms doing approximately the same thing. His duties include using architectural plans to prepare pricing bids to the subcontractor, closing these transactions, and supervising field work on job sites. He had engaged in some 2000 marble, granite, or tile installations, spending about 25 percent of his time at construction sites. He did not install marble, but had supervised its installation and knew how it was done. His function is basically inspection. He has been familiar with the term "quirk miter" throughout his working experience.

Defendant called William James Miranda, a bricklayer-stone mason and the business agent for the Bricklayers, Stone Masons, Calkers and Block Layers Union in Los Angeles. He had installed marble over a period of 11 years at about 15 large construction sites, and was familiar with the term "quirk miter."

In exhibit 1, "Defendant's Response to Plaintiff's Request for Admissions," defendant admitted that the marble articles involved herein were not classified as marble slabs because the edges were quirk mitered and that had they not been quirk mitered, they would have been classified as marble slabs. It denied that quirk mitering was a process needed to facilitate installation of marble slabs in building construction and claimed that a quirk miter was an architectural decorative feature.

Exhibit 2 consists of two pieces of marble which illustrate what a quirk miter is. They are apparently not samples of the imported merchandise since they are ¾ inch thick. One edge of each piece has been beveled from the unpolished surface to about ¼ inch from the polished surface. From that point to the polished surface, the edge is at right angles to the polished surface and is itself polished. When the beveled edges of the two pieces are fitted together, a corner is produced, but the polished edges form a small recess instead of a sharp corner. According to the witness Miranda, the edges are cut at the mill with a diamond tipped saw.

Exhibit A is a drawing by Mr. Miranda, depicting, in addition to a quirk miter corner, a miter or stone corner, and a butt corner.

From exhibit A and the testimony, it appears that each edge forming a stone miter is cut at an angle from the back to the front surface so that the pieces fit together closely and form a pointed corner.

As to the butt corner, it appears that the edges of the pieces are left square and are butted at the back edge, leaving a recess of the same dimension as the thickness of the marble.

Both witnesses said that marble corners may be formed by a quirk miter, stone miter, or butt corner.

The witnesses described two methods of installing marble: Where the marble piece is in excess of 1 square foot, it is mechanically tied to the structure by drilling a hole into the edge of the stone, putting copper or brass wire into the hole and tying it back to the structure. If it is less than 1 square foot or less than 15 pounds in weight, it can be installed with mastic, a material-like glue which is spread on the back of the marble and on the wall, thus affixing the marble to the wall. First, the corner pieces are set in both directions. The corner does not have to be square, 90 degrees, but could be 45 degrees, depending on the needs of the job. After the corner is set, the stone mason proceeds with the regular laying out of the bond and the marble, keeping the marble plumb and level. Generally, the architect or contractor specifies the method to be used. For the lighter units, some form of the mastic system would be designated.

Mr. Clarke testified that a quirk miter has two purposes, one to facilitate setting the stone, and the other for a nicer appearance. It also hides the thickness of the marble being used. He said that where a piece is quirk mitered, the edges of the stone can be drilled, thus eliminating the necessity for a lace anchor or tunnel to be drilled in the back of the stone. According to the witness, when one piece butts against another, a lace anchor is required. He called that joint a stone miter and said the corner itself must be arrised or swiped. In his opinion, a quirk miter corner is easier to install because there is more leeway in setting it; it can be opened slightly in case the wall is not plumb or square; the joint can be widened on one side. In his experience 70 percent of the installation jobs are quirk mitered. He knew of nothing that is ever done to the edge of marble, other than quirk mitering, which is needed to facilitate installation as tiling or veneering in building construction.

Mr. Miranda testified that a piece of marble with a squared edge and no mitering can be installed but that to make a finished job, the corner would have to be either quirk mitered or stone mitered. The owner would not like a butt corner because it would be clumsy looking and have a harsh appearance. The joints should narrow at the corner to match those that are down the center of the wall.

Mr. Miranda's testimony as to whether it is easier to install a piece of marble that has been quirk mitered was somewhat contradictory: He said first that it was easier to install a quirk mitered piece. Then he said that to the craftsman it did not matter whether the corner was quirk mitered or butt joined insofar as the labor of laying and installing it was concerned; the method of application was identical; the process and the difficulty were the same.

When asked to explain, he stated:

The benefit in using a quirk miter is when the owner of the building and the architect come to look at the job, the mason would be satisfied that he had the best unit to lay on the corner, which would be the quirk miter, and the satisfaction in doing the job the accepted trade way would help the mason in his daily work. * * * The best way to do a marble job on your corners is the stone mitered corner or the quirk mitered corner, and in either case the mason would be satisfied in doing that.

Q. Are you saying, then, that a quirk miter aids in the installation of marble——A. Yes; it does.

Q. [Cont'g] for a corner?——A. Yes; it does.

Later he testified that the actual setting in place was not different, but that there might be a difference in trimming the corners. The mitered corners usually require some handwork, finishing, and calking. He also said there was a difference in the time it took to do the job. The stone mitered corner takes the most time, because some owners like to have the corner look like it is one solid piece and not two pieces. With a quirk miter this does not occur since it is a definite corner; it shows. He said that butt corners are raw corners which leave a recess that is the actual dimension of the unit. Where the pieces are ⅜ inch thick, the recess would measure ⅜ inch from each side. The pieces are put together, leaving a little line for tolerance at the back edge.

The quirk miter requires the same installation only the points are drawn closer together so that as one looks up the wall, the exposed edges all appear identical. The witness said that out of 100 units there are times when only 70 may be used because of the workmanship of the cutting. In other words, when lining up marble with quirk miters, one runs into a problem of tolerance.

The issue in this case is whether the merchandise is classifiable as slabs as defined in headnote 2, schedule 5, part 1C, *supra*. The definition limits "slabs" to flat stone pieces of certain dimensions, whether or not cut to size or rubbed or polished, "the edges of which have not been beveled, rounded or otherwise processed except such processing as may be needed to facilitate installation as tiling or veneering in building construction."

This provision was recently before the court in *Dushoff Distributing Corp.* v. *United States*, 71 Cust. Ct. 158, C.D. 4489 (1973), where it was held that marble saddles, beveled for safety purposes and not to ease handling or aid in installation as thresholds, were not classifiable as marble slabs.

In the course of the opinion the court quoted the following from the Tariff Classification Study of November 15, 1960 (schedule 5, p. 24):

A very difficult problem arises under the current provisions in determining whether the slabs or tiles have been processed for use

as lamp bases, table tops, desk sets, etc. In order to make certain the intended scope of this provision, the definition specifies that a slab may or may not be cut to size and that it may or may not have one or both of its surfaces rubbed or polished, but the definition does not permit stone pieces to be included if the edges have been beveled, rounded, or otherwise processed except for such processing as may be needed to facilitate installation as tiling or veneering in building construction. The headnote is not intended to preclude from classification as slabs stone pieces the edges of which have merely been "eased" for handling purposes. The definition will result in the classification of some articles at the higher rate of 21 percent ad valorem in item 514.81. This change, however, is incidental to necessary clarification.

The court then said:

Under the definition, the term "slabs" is limited to flat stone pieces, not over 2 inches thick, having a facial area of 4 square inches or more, whether or not cut to size and whether or not rubbed or polished, the edges of which have not been beveled, rounded or otherwise processed. An exception to the requirement that the edges not be beveled, rounded or processed is made as to "such processing as may be needed to facilitate installation as tiling or veneering in building construction." The exception must be strictly construed and not extended to merchandise not clearly within its terms. *Goat and Sheepskin Import Co. et al.* v. *United States*, 5 Ct. Cust. Appls. 178, T.D. 34254 (1914) ; *Joleo Impex Co.* v. *United States*, 45 Cust. Ct. 6, C.D. 2189 (1960) ; *A. Zerkowitz & Co., Inc.* v. *United States*, 54 Cust. Ct. 151, C.D. 2525 (1965), appeal dismissed 52 CCPA 125 (1965) ; *The De Haan Company* v. *United States*, 57 Cust. Ct. 39, C.D. 2722 (1966), *aff'd*, 55 CCPA 76, C.A.D. 936 (1968).

\* \* \* \* \* \* \*

As I read the definition, it limits the processing beyond cutting to size and polishing to such as facilitates the placing or setting the stone pieces in question in their final location in the wall, floor or ceiling of a building. The Tariff Classification Study points out that the exception was intended to allow stone pieces whose edges had been "eased" for handling purposes to be classified as slabs. There is nothing in the definition or in the legislative history to indicate that Congress intended the exception to be read as broadly as claimed by plaintiff, to cover processed stone pieces used in building construction so long as the processing is necessary to complete a floor arrangement or tiling job or avoid delays caused by having the work done at the site. To so construe it would thwart the purpose of the definition and open the door to more litigation.

Plaintiff argues that there must be some processing which falls within the exception, otherwise the language would be useless and unnecessary, and that the exception must refer to quirk mitering on the theory that there is no other type of processing. In support of this

proposition, plaintiff relies on Mr. Clarke's negative answer to the question:

> Is there anything to your knowledge that is ever done to the edges of marble, other than the quirk mitering, which is needed to facilitate installation as tiling or veneering in building construction?

Mr. Miranda was asked a similar question but his response referred to polishing and cleaning the stone and not to what was necessary to facilitate installation.

The Tariff Classification Study, *supra*, indicates that the purpose of the exception was to allow classification as slabs to pieces which had been "eased" for handling. An example of this might be the removal of the sharp arris by beveling or rounding, as suggested in defendant's reply brief.

Therefore, plaintiff's primary argument fails and it must be determined whether the merchandise consists of flat pieces the edges of which have not been beveled, rounded or processed except to facilitate the placing or setting the pieces in the wall or to ease handling.

The evidence establishes that there are several methods of forming marble corners in buildings; that each one has its own problems of installation; that in general the method of application is the same; that a corner will have a different appearance, depending upon whether it is a butt joint, a stone miter or a quirk miter; and that one reason for using quirk mitered pieces is to give an attractive appearance to the building.

The term "miter" is defined as follows:

Webster's Third New International Dictionary (1968):

> miter n. * * * 2a(1) a surface forming the beveled end or edge of a piece where a miter joint is made
> miter v. * * * 2a: to match together in a miter joint (~the ends of the boards) : bevel the ends of for the purpose of matching together at an angle * * *

The Reader's Digest Great Encyclopedic Dictionary (1966):

> miter n. * * * 6 * * * b The beveled edges that come together to form a miter joint.
> miter joint A joint made of two pieces of material whose joined ends have been beveled at equal angles as at the corner of a picture frame.

It is evident that the merchandise in the instant case has been beveled for the purpose of matching the pieces together to form a particular type of corner. According to Mr. Miranda, cutting for this purpose is difficult and many pieces may have to be rejected because they do not form matching units all the way up the wall. The processing was done

to create articles which would fit together to make quirk mitered corners, not for ease of handling or to facilitate installation. Such pieces are not slabs; they are articles cut into a particular shape for a particular use.

Under the Tariff Act of 1930, a distinction was made between marble used as material to make various articles or kept in stock to be employed in a number of kinds of marble installations, and marble which was used in its imported condition as a wholly or partly manufactured article. *Dushoff Distributing Corp.* v. *United States, supra; John H. Faunce Phila., Inc.* v. *United States,* 71 Cust. Ct. 176, C.D. 4493 (1973), and cases cited.

The merchandise here is used in its imported condition as quirk miter corners. In view of the legislative purpose as noted in the Tariff Classification Study, *supra,* I conclude that it was not the intent of Congress to broaden the provision for slabs to include stone pieces which have been processed beyond ease of handling or installation into articles used in their imported condition for a special purpose.

I find that the merchandise herein does not fall within the definition of slab in headnote 2, *supra,* and was properly assessed with duty under item 514.81, *supra,* as other marble articles, not specially provided for.

The action is dismissed. Judgment will be rendered accordingly.