BEFORE THE THIRD DIVISION, DECEMBER 9, 1965

No. 69681.—Imports, Inc. *v.* United States, protests 62/9455 and 62/1235 (Los Angeles).

DONLON, Judge: In these cases, which were consolidated for trial, the issue is the dutiable classification of certain earthenware articles that were imported from Japan. They are described in the invoices as mugs and were so classified by the collector in liquidation. The protest claim is that they are cups, not mugs, and that they should be classified as cups.

There is *eo nomine* enumeration of cups in paragraph 211, as modified by the General Agreement on Tariffs and Trade (T.D. 51802), which is the provision for earthenware tableware and kitchenware and utensils, as follows:

\* \* \* \* \* \* \*

cups valued at $1 or more per dozen;------------------------ 10¢ per doz.
pieces and
20% ad val.

In a subsequent modification of paragraph 211 (Protocol of Terms of Accession by Japan to the General Agreement on Tariffs and Trade, T.D. 53865), there was particular enumeration of both mugs and cups, as follows:

\* \* \* including \* \* \* mugs, cups, \* \* \*
not specially provided for:
Tableware, kitchenware, and table and
kitchen utensils:

\* \* \* \* \* \* \*

articles which are not plates, cups, or
saucers and which are valued over $1
but under $2 per dozen articles;
all the foregoing------------------------------- 10¢ per doz.
pieces and
40% ad val.

These articles are accepted as being earthenware tableware, or kitchenware, of a value at least $1 but under $2 per dozen pieces. If they are cups, they take the duty rate which the protest claims. If they are mugs, as the collector classified them, or some earthenware article of tableware other than plates, *cups*, or saucers, then the rate of duty which the collector assessed is correct. There is no suggestion, and on the record before us there could not be, that these are either plates or saucers. But are they cups? That is the only question before us for decision. It is a question of fact which the court decides on the record that is before us.

The article in question is a hollow vessel, more or less in the shape of a child's head, with a footed part that appears to represent the neck of the child. There is a sturdy handle. There is also a decorated saucer. The two articles are designed to be used together, although they do not fit snugly in the customary position of a cup and its saucer. The well of the saucer is somewhat larger than the bottom of the vessel. The saucer is decorated on both sides. The side with the well has a pink stripe around the rim, and the other side is decorated to represent either a hat or the hair of the child. This saucer may be placed on top of the vessel, thus simulating a hat or the top of the child's head. It fits much more snugly that way than as a base, or support, for the vessel. The vessel is light. The saucer is noticeably heavier.

Plaintiff's sole witness, Mr. Herman Gartzman, plaintiff's president, testified that plaintiff sold the merchandise in issue as a cup, together with the saucer. He did not say how he ordered the merchandise.

Offering of the merchandise as cups is not corroborated by the pricelists, catalogs, or invoices that are in evidence; nor is there any testimony of persons, other than plaintiff's president, with knowledge of the trade. It is difficult to reconcile the documentary evidence with Mr. Gartzman's unsupported oral statement.

The merchandise was sold to plaintiff as mugs. It was so described in the invoices which plaintiff filed with the entry papers. It was offered to the trade in plaintiff's catalog as mugs. To be sure, Mr. Gartzman testified that the catalog was "issued when we originally had the line made up," that a few of the catalogs "did get out of our hands," and that "we don't have the merchandise because it was wrong." This testimony is far from clear. There is no showing why the catalog description which was written when the line was originally made up, is not a correct description. Nor is there any showing that some new catalog, or new catalog sheets, were issued in substitution for the catalog which offered the merchandise as mugs.

There is no showing, but only the unsupported declaration of plaintiff's president, that children, for whom the vessel was designed, customarily use the saucer as a rest when drinking milk from the vessel. Those familiar with the table habits of small children may indulge in experiment with exhibits 1 and 2, thereby evaluating for themselves the decibel level that such a use generates. It seems improbable that mothers would willingly provide that kind of noise opportunity when it could readily be avoided!

There are in evidence a number of exhibits said to represent mugs. They are not parts of a set and are not sold with saucers.

Mr. Gartzman testified that in earthenware the cup does not always fit the well of the saucer because earthenware has a tendency to shrink more than porcelainware, making it impossible to have a perfect fit. However, in better quality ware, there is less shrinkage, and the fit is almost perfect. An American-made earthenware cup and saucer were received in evidence as plaintiff's collective exhibit 11. It consists of an ordinary shaped teacup and saucer, and the cup fits into the saucer fairly well. The witness said this is not typical of the variance in fit of an imported earthenware cup and saucer, since they are made of heavier material and there is greater shrinkage in light material than in heavy material.

Congress and the trade negotiators had in mind two distinct articles that are known in the trade and commerce of the United States, respectively called cups and mugs. They have separate enumerations and different tariff rates.

Not everything that may be called a cup, is a cup for tariff purposes. Standing alone, "cup" has been held to designate "a bowl-shaped drinking vessel commonly set on a saucer and used for the service of hot liquids, such as tea, coffee, or soup." *Ross Products, Inc.* v. *United States*, 46 Cust. Ct. 8, C.D. 2226, at page 12. In that particular *Ross* case, an eggcup was held not a cup for tariff purposes.

In an earlier *Ross* case, *Ross Products, Inc.* v. *United States*, 40 Cust. Ct. 158, C.D. 1976, it was held that a fancifully designed vessel, with ornamental bird figure and whistle, for use by children to drink milk, without a saucer, was a mug and not a cup.

This vessel, likewise, is a novelty item that was designed for use by children to drink milk. It does not conform to the traditional concept of a cup, nor is its principal use the service of hot liquids. The so-called saucer fits badly in its function as a saucer, but fits rather well as the hair piece or hat on top of the head of the child depicted on the vessel.

Whether or not this vessel conforms precisely to some traditional concept of a mug, it is not necessary now to decide. It suffices that plaintiff's proofs do not establish what its protest claims, namely, that it is a cup within the tariff

concept of cups. It is an article of tableware that is *not* a plate, a cup, or a saucer. That is the collector's classification. Therefore, the collector's classification has not been shown to be erroneous.

The protests are overruled.

Judgment will be entered accordingly.

### CONCURRING OPINION

NICHOLS, Judge: I agree with Judge Donlon that the protests cannot be sustained, and with almost all she says, but there are other considerations that should also be mentioned, in my opinion.

The onus is on the plaintiff to establish every necessary element of his case by competent proof. If he fails to do this, even *prima facie*, we should not attempt to make in ignorance our own classification decision. We should simply say the burden of refuting the collector's decision has not been met.

Both as matter of law, and common sense, it must be presumed the administrative decision is considered and informed. It is presumed that the collector's classification is correct and that he found all the necessary facts to exist which brought the goods within that classification. *F. H. Kaysing* v. *United States*, 49 CCPA 69, 71, C.A.D. 798; *United States* v. *Zoltan Erdosi*, 40 CCPA 137, 139, C.A.D. 509. Section 500 of the Tariff Act of 1930 provides that it is the duty of the appraiser to describe the merchandise in order that the collector may determine the dutiable classification thereof. The collector is not required to make an independent examination, and, where he adopts the appraiser's description, it is made his own, and all findings essential to the classification are presumed to have been made. *United States* v. *Albers Bros. Milling Co. et al.*, 35 CCPA 119, C.A.D. 380. As the appraiser may use all reasonable ways and means to ascertain the value of the merchandise (section 500(a)(1)), the collector (or those advising him) may use all reasonable ways and means to determine the proper classification of the merchandise. Under section 502(a), the Secretary of the Treasury is to disseminate such information as may be necessary to secure just, impartial, and uniform classification. In the case of merchandise covered by trade agreement modifications, the Secretary and his delegate, the Commissioner of Customs, have unusual facilities for knowing what, if anything, the negotiators intended in doubtful or ambiguous cases, since customs officials were present as technical advisors when such agreements were negotiated, and their information is available. This does not mean, of course, that the language of trade agreements may be disregarded. I am talking only about instances of ambiguity not resolvable by the usual canons and methods of interpretation.

When, as here, a particular article was classified for tariff purposes under the 1930 act as part of a mass of things all subject to the same rate of duty, but was later singled out for a concession, general principles of construction require that the designation be strictly, though fairly, construed. While tariff laws are made for the future and are intended to embrace new articles as they are developed (*C. J. Tower & Sons* v. *United States*, 47 CCPA 85, 87, C.A.D. 734), it must be recognized that trade agreement negotiators are unlikely to intend to include articles not clearly within the terms of the language used. Otherwise, the statistical material before them would have no validity; they would not be able to anticipate the economic effects of a concession nor to obtain any appropriate *quid pro quo* from other countries. An example of the technique of interpretation involved is a recent case involving a rate concession for men's, youths', or boys' footwear; we held it did not apply to a type of footwear worn by members

of both sexes indifferently. *A. Zerkowitz & Co., Inc.* v. *United States*, 54 Cust. Ct. 151, C.D. 2525, appeal dismissed August 4, 1965. We said (p. 159) :

> The provision for a 10 per centum rate for men's, youths', or boys' footwear is an exception carved out of a general rule. As such, by well-known principles, it must be strictly construed. *Goat and Sheepskin Import Co. et al.* v. *United States*, 5 Ct. Cust. Appls. 178, 180, T.D. 34254 ; *Joleo Impex Co.* v. *United States*, 45 Cust. Ct. 6, 10, C.D. 2189. In the latter case, the principle was applied by the first division in an opinion by Wilson, J., holding that the exclusion of "ostrich feathers" from the *termination* of a trade agreement concession on "crude feathers" did not apply to feathers of the South American rhea, sometimes, but loosely, referred to as an ostrich. [Emphasis quoted.]

Turning now to the case before us, nothing appears in it to make the above-stated principles inapplicable. Counsel seem to agree *sub silentio* that the article in litigation must be either a cup or a mug. We are put somewhat in the position of a man who conceives himself required to determine whether a mule is a horse or a jackass. I am not sure he should thus limit himself. The issue here is, as Judge Donlon says, really only whether the article is a cup, and if it is not proved to be one, the protest fails, whatever other thing it may be.

Assuming, nevertheless, as counsel do, that the article has to be either a cup or a mug, and cannot be both, what is the evidence? I think my respected colleagues were asked in this case to make bricks without straw. The evidence is, first, the sample of the merchandise, exhibit 1, admitted with other exhibits for comparison stated to be uncontestably cups or mugs. A sample can be a "potent witness," and exhibit 1 has evidently testified in a manner that my colleagues were able to hear, only unfortunately they did not hear it the same way. I kept exhibit 1 on my desk for several days and it did not say a thing to me. It is, perhaps, a cuppish mug or a muggish cup, but merely looking at it does not tell me which. One can determine the salient features of common cups and mugs and form an opinion which of these predominate in the imported article, but one can feel no assurance the conclusion thus reached is anything but subjective, that it does anything to implement the intent of the trade agreement negotiators who singled out cups and not mugs for special rate concessions, or that it otherwise effectuates the general propositions I stated at the outset of these observations.

Second : The importer's testimony constitutes all we have of an oral nature. It tells us something about how the article originated, why it was given the characteristics it has, and how it was expected to be used. That he calls it a cup when he sells it in the trade—as he testified—takes us no distance towards determining whether it is a cup in common speech, or in the trade and commerce of the United States generally, or in the purview of the negotiators. A tariff classification decision cannot be based on the importer's own terminology : Thus in *Gitkin Co.* v. *United States*, 54 Cust. Ct. 182, 186, C.D. 2530 (appealed 5214), we said :

> The evidence to substantiate the claim that this merchandise is commonly known as a door includes an advertising brochure issued by plaintiff, * * * newspaper advertisements run by retail sellers, * * * and commercial invoices issued by plaintiff to its customers. * * * The trouble with this evidence is : First, it reflects too much plaintiff's own usage only. Even the advertisements were based on mats or copy furnished by plaintiff or its affiliate.

While I cite with caution a case on appeal, I should observe that if there is any case where common meaning can be derived from a plaintiff's own usage alone, *Gitkin* is a far more acceptable instance than the one now at bar. There is some basis for a surmise, from the invoices and a catalog, that plaintiff here may have called the article a mug before appreciating the unfavorable tariff consequence of such an appellation, but the facts as to what plaintiff calls the merchandise are not fully developed and if developed would not be controlling.

There is no evidence in the record as to what anyone else calls it or would call it.

Thus, in my view, the plaintiff's evidence, even if the sworn part is fully believed, fails to embody the facts necessary for us to determine that the classification of the article should be as claimed in the protests. This being so, the Government quite properly introduced no evidence to back up the collector's classification. Therefore, we have nothing before us which would enable us to determine for ourselves what the proper classification of the merchandise is. Because of the unrebutted presumption, we must sustain the collector's classification and overrule the protests.

DISSENTING OPINION

RICHARDSON, Judge: Most of the cases in which the third division of the Customs Court has been called upon to decide whether or not a container is a cup have not involved perfect specimens of after-dinner tea or coffee cups, and the division has made its determination according to whether the characteristics of the container in issue predominate in favor of or against classifying it as a cup. When the characteristics of the container have more resembled in physical appearance and use a cup than another article, like for example a mug, the division has classified the container as a cup. Using this same method of comparison in considering the evidence adduced in this case, I reach the conclusion that the container in issue should be classified as a cup.

The only witness called to testify was Herman Gartzman, president of Imports, Inc., the plaintiff in this case. His testimony may be summarized as follows: His firm brings in ceramic items and miscellaneous sundry merchandise, mostly from the Orient, to sell in this country. He is familiar with the items referred to as Yum-ee cups and saucers, which items are listed separately on the invoice; item 800 is listed as a mug and items 802 and 803 are listed as saucers. Counsel for the plaintiff stated that the classification of the saucer was not in issue but that the two items were a unit; therefore, samples of both were offered in evidence. The cup or mug (which for the time being will be referred to as a container) was received in evidence as plaintiff's exhibit 1 and the saucer as plaintiff's exhibit 2. The container is a decorated earthenware article more or less in the shape of a child's head with a footed part representing the neck. It has a handle on one side. The child's face is depicted on the front portion and, on the back, are the words "For my milk break." The overall height of the article is $4\frac{1}{4}$ inches. The portion representing the head, which is used to contain liquid, is a little over 3 inches high, is wider at the top ($2\frac{7}{8}$ inches), and tapers to about $2\frac{1}{4}$ inches, where it joins the foot, which flares out to a diameter of $2\frac{3}{4}$ inches at the bottom. The saucer has a diameter of 6 inches and a well measuring $3\frac{1}{4}$ inches. The container, therefore, does not fit snugly into the well. The saucer is decorated on both sides. The side with the well has a pink stripe around the rim, and the other side is decorated to represent the hair of the child. It may be placed on top of the container to simulate a hat or the top of the head of the child. It fits more snugly that way than as a base for the container. The container is light and the saucer is noticeably heavier.

Mr. Gartzman has been in an occupation that dealt with ceramic ware since 1929 and has dealt in such ware, cups and saucers, tableware, mugs, and dinnerware sets all over the United States. He imports other tableware items matching the container and saucer in this importation. After importation, such items are assembled in the United States for sale as open stock dinnerware. Illustrations of some of the articles were received in evidence as plaintiff's exhibits 3 through 6. They show plates or dishes of different sizes, each depicting a boy and girl thereon.

Mr. Gartzman was familiar with items which are cups and items which are mugs and described a mug as an object that is basically cylindrical, is normally very heavy, and is generally of a square type shape. He agreed with the following definitions from Webster's New International Dictionary, second edition, unabridged:

cup. A small open bowl-shaped vessel used chiefly to drink from, with or without a handle or handles, . . . a handled vessel of china, earthenware, or the like, commonly set on a saucer and used for hot liquid food such as tea, coffee, or soup.

mug. A kind of earthen or metal drinking cup, with a handle,—usually cylindrical, with no lip.

The witness testified that there had been a mug in the Yum-ee line and produced an illustration thereof, which was received in evidence as plaintiff's exhibit 7. The exhibit depicts a cylindrical article, narrowed at the center and wider at the top and bottom, with a flat bottom. A child is portrayed thereon. The witness said it was taller than the container involved herein and was not used with a saucer.

Mr. Gartzman stated further:

No, that is the main point. A mug is not used with a saucer. A cup is used with a saucer. We made a cup and saucer combination. There it is standing that way, and we also made it as a little novelty type, to put a hairline on the top; in other words, when not in use for a child, it is a novelty thing, and looks cute, but it is used as a cup and saucer, and we did make the other dinnerware together along with it as a unit of sale. It could be sold individually, because cups break more often than saucers. We brought them in as open stock. Mugs do not come in as any classification of open stock mugs. . . .

The witness said he had designed a mug, but then decided it would not sell in volume, so the cup was created. The depth was cut down so that children could handle it easily, and a footed base was added with novelty decorations, such as lacework or a bow tie.

There were then produced and received into evidence articles which the witness stated were mugs. Plaintiff's exhibit 8 is a slightly barrel-shaped container, 3½ inches high, with a top diameter of 3 inches, and a bottom one of 2½ inches. The bottom is flat and the article is not footed. It has a handle. The witness called this a standard mug.

Plaintiff's exhibit 9 is a taller article with concave sides, narrowed at the center and wider at the top and bottom. It is 4¼ inches high, with a top diameter of 3⅛ inches and a bottom diameter of 2½ inches. The bottom is flat and the article is not footed. It has a handle. The witness said that this shaped mug was made in the Yum-ee line.

Plaintiff's exhibit 10 is a cylindrical straight-sided article, 3½ inches high, with a top diameter of 3 inches and a bottom one of 2¾ inches. It is flat bottomed and has a handle. It is not footed.

The witness stated that none of these mugs was ever used with a saucer and was not part of a set.

According to Mr. Gartzman, cups and saucers are not normally imported or purchased by dealers in the same quantity because cups break faster. As a general rule, three or four cups are imported for one saucer. While dinnerware is generally brought in in sets with an equal number of cups and saucers, open stock items are sold separately and are invoiced by the individual item. Based upon his experience in dealing with this type of merchandise and selling it at retail and at wholesale, the witness testified that articles, such as plaintiff's exhibits 1 and 2, are sold in the trade as cups and saucers. Plaintiff's exhibit 1 is also sold separately, as an open stock item.

Mr. Gartzman was shown the invoices covered by protest No. 62/1235, and stated that they listed mugs but no saucers. He explained that the imported merchandise was a novelty item that could be made only in one place in Japan and they could not make more than one item at a time.

The witness was then shown two sheets which he said were part of a catalog which was issued when the line was originally made up. He stated that most of the copies were not used because they were wrong, although a few got out of his hands. These sheets were received in evidence as defendant's collective exhibit A. They depict the articles involved herein. One is described:

BOY MUG
HIGH-GLOSS UNDERGLAZED CERAMIC
4¼" HIGH

| #800 | 6 dz carton | 42 lbs | Retail | .59 ea |

The "Girl Mug" is similarly described. The witness was asked whether the sheets showed how he sold the item, to which he replied:

I would say, yes, not fully.

The witness stated that plaintiff's exhibit 1 is not advertised as a mug; it is a cup. He was then shown another sheet which he said was part of the same catalog and illustrated plaintiff's exhibits 1 and 2. This was received in evidence as defendant's exhibit B. It depicts the boy and girl containers, each with a saucer placed over it. It states:

BOY SAUCER
6" WITH BLUE STRIPE
UNDERGLAZED CERAMIC

| #802 | 12 dz ctn | Retail | .25 ea |

BOY MUG
FULL COLOR
4¼" HIGH

| #800 | 6 dz ctn | Retail | .59 ea |

The description as to the girl saucer and mug is the same except that the girl saucer has a pink stripe.

According to the witness, in earthenware, the cup does not always fit the well of the saucer because earthenware has a tendency to shrink more than porcelain-ware, making it impossible to have a perfect fit. However, in better quality ware, there is a lesser amount of shrinkage, and the fit is almost perfect. An American-made earthenware cup and saucer were received in evidence as plaintiff's collective exhibit 11. It consists of an ordinary shaped teacup and saucer and the cup fits into the well fairly well. The witness said it was not typical of the variance in the fit of an imported earthenware type cup and saucer, since it is a heavier piece of material and there is greater variance in the light piece.

The issue in this case is whether the imported container is a cup or an article of tableware other than a plate, cup, or saucer, to wit, a mug, as classified by the collector.

The question of what was meant by the term "cups" in the trade agreement with the United Kingdom, T.D. 49753, was before the court in *Johnson Bros.* v. *United States*, 15 Cust. Ct. 113, C.D. 955. Exhibits illustrative of well-known cups were received in evidence, such as teacups, coffee cups, after-dinner coffee cups, jumbo coffee cups, bouillon cups, cream soup cups, handled custard cups, custard cups without handles, and eggcups. The court quoted the following from

the "Digests of Trade Data with Respect to Products On Which Concessions Were Granted by the United States":

Except for the value bracket limitations, no restrictions on the types of decorated and colored earthenware plates, cups, and saucers entitled to the reduction in duty was written into the agreement, since it was intended to cover all types of plates, cups, and saucers coming within the descriptive language. A complete list of the different articles would not be practicable, but the more important articles include flat plates, coupe and deep soup plates, cake and compartment plates, tea, coffee, cream soup, bouillon and other cups and saucers, as well as saucers not used in conjunction with cups, such as fruit and oatmeal saucers.

It was held that, in view of the samples and in the light of the common meaning of the terms, puree cups and chowder cups were properly dutiable under the trade agreement provision for cups.

On the other hand, in *Ross Products, Inc.* v. *United States*, 46 Cust. Ct. 8, C.D. 2226, it was held that an eggcup was not classifiable as a cup. The court quoted several definitions of the term "cup" and then stated:

It follows from these definitions and from common knowledge that, when used in connection with china and earthenware, the term "cup" standing alone designates a bowl-shaped drinking vessel commonly set on a saucer and used for the service of hot liquids, such as tea, coffee, or soup. In combination with other words, it describes articles, more or less cup-shaped, used for other purposes, such as eggcups, custard cups, measuring cups, sherbet cups, and fruit cups.

The court, after referring to the *Johnson* case, *supra*, and the excerpt from the Digest of Trade Data quoted above, stated:

In the instant case, the only witness testified that an eggcup is not a cup and is not bought and sold as such. In fact, an eggcup is not one of the articles which come to mind when the word "cup" is used in connection with ceramic tableware or kitchenware. It is not used to drink from nor is it bowl-shaped nor does it have a saucer as a companion piece, but is ordinarily set upon a plate. It is designed to hold an egg which is generally eaten from the shell. The containing portion is in an elliptical shape to fit the egg rather than in a bowl shape convenient for drinking. It can be identified only by the use of the word or prefix "egg" preceding "cup." It is not known, bought, or sold under any designation other than as an eggcup.

*Ross Products, Inc.* v. *United States*, 40 Cust. Ct. 158, C.D. 1976, involved the question of whether the imported article was a cup or a mug. It consisted of a decorated earthenware, barrel-shaped drinking vessel, about 3½ inches high and 2¾ inches in diameter, with a curved handle, on top of which was a figure of a bird through which one could blow to make a whistle sound. According to the record, it was used by children for the purpose of drinking milk and was used without a saucer. The diameter of the top was only slightly larger than that of the bottom. It had no foot. It was sold as a milk cup and as a milk mug. The court held the article to be a mug, stating:

Paragraph 211, as originally enacted by Congress, enumerates, among other articles, both mugs and cups, indicating that Congress considered a mug to be different from a cup for tariff purposes, even though a mug has been defined by lexicographers as a kind of cup. The General Agreement on Tariffs and Trade, T.D. 51802, provides reduced rates of duty for certain articles covered by paragraph 211, including cups, valued at $1 or more per dozen, but mugs are not mentioned. The Torquay protocol, on the other hand, enumerates both mugs and cups, provides specially for some cups, and also covers other tableware in general. It is clear, therefore, that both Congress and the negotiators of the trade agreements classified cups and mugs separately. Consequently, if the imported merchandise is a mug, it cannot be classified as a cup, as the former is a more specific designation.

Plaintiff claims that the instant merchandise is not a mug, principally because it is not cylindrical (straight-sided) in shape. Reliance is placed upon definitions describing a mug as a kind of earthen or metal drinking cup, with a handle, usually cylindrical in form. Webster's New International Dictionary, 1952 edition; Funk & Wagnalls New Standard Dictionary, 1949 edition; The New Century Dictionary, 1927 edition. Plaintiff's witnesses also testified that a mug is more or less straight-sided in shape.

Both of the defendant's witnesses, who had had many years' experience in the earthenware industry, gave a more detailed definition of a mug, to the effect that it is either straight-sided or barrel-shaped, measuring about the same across the top as across the bottom, having a flat bottom, heavier than a cup, and not used with a saucer. Following this definition, they stated that the instant merchandise is a mug. Furthermore, plaintiff's witness Mintz testified that while his firm calls the article a milk cup, it is also sometimes featured as a milk mug.

The sample itself is a potent witness. While it is barrel-shaped, rather than strictly cylindrical, its height exceeds its diameter, and it measures about the same across the top as across the bottom. It is thus more or less cylindrical in form, as are the mugs introduced in evidence as collective illustrative exhibits A–1, A–2, A–3, and A–4. It is heavier than a cup, is shaped differently, and is not used with a saucer, as cups ordinarily are. In our view, it is a mug within the common understanding of that term.

In the instant case, plaintiff claims that the article is a cup on the ground that it is bowl-shaped or vessel-shaped; that it is footed; and that it is designed to be used with a saucer. Defendant contends that the article is unlike the cup in plaintiff's collective exhibit 11 and does not resemble a puree, chowder, or any other kind of cup referred to in the decisions, *supra;* that it is used for the service of milk and not hot liquids; that it does not fit snugly into the well of the saucer; that the saucer is used as a hat or lid; that more containers than saucers were imported; that the witness' statements that the merchandise was designed and sold as a cup were controverted by the descriptions in defendant's exhibits A and B.

It is evident from an examination of the sample that this merchandise is a novelty item, designed for children, and that it does not conform to the ordinary concept of a teacup, such as plaintiff's collective exhibit 11, nor to that of mug, such as plaintiff's exhibits 8, 9, and 10. The evidence is contradictory as to how this article is sold in the trade. Mr. Gartzman testified that it was designed as a cup and was created with the saucer as a two-piece unit, and that the two were sold in the trade as cups and saucers. On the other hand, the merchandise involved as "mugs" and the pages from the plaintiff's catalog (defendant's exhibits A and B) described the articles as "mugs." According to the witness, the catalog was not generally distributed to the trade because of some error therein, which was not specified. Whether or not the containers were always or even usually sold with saucers is not clear, nor is there any evidence as to how the article was purchased or used by the consumer.

Even though there is conflicting evidence as to whether the container is advertised, described, and sold as a cup or a mug, the sample of the merchandise much more resembles a cup than a mug. It clearly does not conform to the definition of a mug. It is neither cylindrical nor barrel-shaped, nor does it measure the same across the top as across the bottom. Rather than being heavier than a cup, it is very light. It has a bowl-shaped container portion which tapers at the base and it is footed. Whether or not it is always bought, sold, or used with a saucer, a saucer was designed to go with it, and, according to the witness, the two were sold as a cup and saucer. That the container does not fit into the well of the saucer very snugly is accounted for by the fact that this is a novelty item, and the saucer is designed also to rest over the top to

resemble the top of the child's head or a hat. While the article is apparently designed for the service of milk, which is usually cold, milk is sometimes served hot. The article could also be used for cocoa or any other warm drink given to children. The fact that it may ordinarily be used to contain cold milk does not establish that it is not a cup. For instance, some soups are served cold, but soup and bouillon cups are specifically mentioned in the Digest of Trade Data, *supra*.

I would hold, therefore, that the article involved herein is a cup and is properly subject to duty under paragraph 211 of the Tariff Act of 1930, as modified by the General Agreement on Tariffs and Trade, T.D. 51802, at 10 cents per dozen pieces and 20 per centum ad valorem, as cups valued at $1 or more per dozen. I would sustain the protests.