(C.D. 2128)

A. J. TAYLOR OF SANTA FE, NEW MEXICO *v.* UNITED STATES

United States Customs Court, First Division

(Decided October 23, 1959)

*Stein & Shostak* (*Philip Stein* and *Marjorie M. Shostak* of counsel) for the plaintiff.

*George Cochran Doub*, Assistant Attorney General (*Samuel D. Spector, Richard H. Welsh*, and *Mollie Strum*, trial attorneys), for the defendant.

Before OLIVER, MOLLISON, and WILSON, Judges; WILSON, J., dissenting

MOLLISON, Judge: The issue in the case at bar is whether certain footwear, imported from Mexico on or about March 10, 1944, consists of "huaraches," within the meaning of that term as used in the Mexican Trade Agreement, in force and effect on the date of importation of the involved shipment. Paragraph 1530(e) of the Tariff Act of 1930, as enacted, provided for duty at the rate of 20 per centum ad valorem upon imported—

Boots, shoes, or other footwear (including athletic or sporting boots and shoes), made wholly or in chief value of leather, not specially provided for * * *.

The applicable rate of duty was reduced to 10 per centum upon such of the foregoing boots, shoes, or other footwear as were huaraches, by virtue of the Presidential proclamation reported in T.D. 50797, relating to the said Mexican Trade Agreement.

In *United States* v. *Weigert-Dagen et al.*, 39 C.C.P.A. (Customs) 58, C.A.D. 464, a majority of our appellate court found that the term "huarache" was ambiguous and of doubtful meaning. In that case, the majority noted that there was no indication that the commercial meaning of the term differed in any way from its common meaning, and there was no field for the application of the rule of commercial designation.

It found that the testimony adduced at the trial of the issue, which was consequently advisory only, did not establish a clear common or commercial meaning for the term, and, in determining the meaning to be given to the term, resorted to the use of an extraneous aid, to wit, the "Digests of Trade Data," issued by the United States Tariff Commission at the time of the Presidential proclamation relating to the trade agreement between the United States and Mexico.

The majority of the court pointed out that the material contained in the said digests had been drawn from the detailed data made available by the Tariff Commission prior to and during the negotiations with Mexico to the Trade Agreements Committee, the United States interdepartmental body charged with carrying out the trade agreements program, and concluded that the definition of the term "huaraches" contained therein was—

* * * the only convincing evidence in the record as to the intent of the contracting parties as to the meaning of the term "huaraches." [P. 66.]

The majority then said:

It seems clear to us that it was the intent of the negotiators of the Trade Agreement with Mexico to provide a duty of 10 per centum ad valorem on the articles, to wit, leather huaraches, described to them by the Tariff Commission, both before and during the negotiations as follows:

*Description and uses.*

Huaraches are leather-soled sandals having woven-leather uppers laced to the insole. The insole is machine-stitched to the outsole, and the heel

is nailed on. They are used principally by women and girls for beach and casual summer wear.

Subsequent to the promulgation of the decision in the *Weigert-Dagen* case, *supra*, another case was brought by importers involving merchandise similar to some of the articles involved in the *Weigert-Dagen* case. In its decision in the second case, *United States* v. *Fuchs Shoe Corporation*, 41 C.C.P.A. (Customs) 179, C.A.D. 547, the majority of our appellate court described the articles involved in that case as follows:

> * * * Exhibits 1, 2, and 4, which are similar in all material respects, appear to be casual or sport shoes. The toe portion, or vamp, .of each exhibit consists of a solid piece of leather laced by narrow leather thongs to the insole which, in turn, is machine-stitched to the outsole. Except 3 is a sport shoe, the upper of which is also a solid piece of leather except at uniformly spaced points where slots are made to accommodate the insertion of narrow leather strips laced therethrough parallel to each other; the strips in turn, are laced through the insole and the insole is machine-stitched to the outsole. That shoe, like Exhibits 2 and 4, has a solid leather closed back quarter, or counter, which is machine-stitched to the sole. There is, in addition, a buckle strap designed to extend over the instep of the wearer. The heels, in all of the exhibits before us, are nailed on.

The merchandise in the case at bar is represented by samples before us as plaintiff's collective exhibits 1 and 2. It is described on the invoice as "Sandalias Niños tamaños surtidos" (children's sandals; assorted sizes). Except for size and color, collective exhibits 1 and 2 are virtually the same.

They are very similar in appearance and construction to exhibit 3 in the *Fuchs Shoe Corporation* case, described above, and that description exactly fits them, except in the following respects: Plaintiff's collective exhibits 1 and 2 herein have no heels attached to the outsoles, and they are of "closed toe" construction, whereas exhibit 3 in the *Fuchs* case has heels attached and is of "open toe" construction. These differences we do not regard as material.

In the *Fuchs* case, the majority of our appellate court reaffirmed its holding that the definition contained in the Digests of Trade Data, hereinbefore quoted, reflected the intent of the negotiators of the Mexican Trade Agreement in the use of the term "huaraches" and further held that the portion of the definition reading "Huaraches are leather-soled sandals having woven-leather uppers laced to the insole" had reference to uppers which were *wholly woven* (as distinguished from uppers such as those in the *Fuchs* case and those in the case at bar, wherein the uppers consist of solid pieces of leather having slots cut therein through which strips of leather are laced).

While relying strongly upon the information contained in the Digests of Trade Data, the majority of our appellate court noted in the *Fuchs* case that, at least insofar as it referred to woven uppers, the definition contained therein was supported by the record testimony,

and that the said definition was acceptable to the parties in that controversy.

The records in both the *Weigert-Dagen* and *Fuchs* cases were incorporated as part of the record in the case at bar, and, in addition, testimonial evidence was offered by the plaintiff herein bearing upon the meaning of the term "huarache" in both the United States and Mexico at and prior to the time of the promulgation of the Presidential proclamation relating to the trade agreement with Mexico.

In view of the fact that the exhibits in the case at bar are basically the same in construction as exhibit 3 in the *Fuchs* case, and that the record in that case (which included the record in the *Weigert-Dagen* case) was incorporated as part of the record herein, it will be seen that the outcome of this case depends upon whether anything contained in the additional evidence offered in the case at bar does effect, or could effect, a conclusion as to the meaning of the term "huarache" different from that adopted in the *Weigert-Dagen* and *Fuchs* cases in the sense of including footwear such as that at bar.

Preliminary to discussing that evidence, and in explanation of our use of the term "could" in the preceding sentence, the question as to whether the meaning of the term "huaraches" adopted by our appellate court in the *Weigert-Dagen* and *Fuchs* cases represented the common meaning thereof comes to the fore. In the *Weigert-Dagen* case, the majority of our appellate court held that the testimonial evidence offered to the court as an aid to its understanding of the term failed—

\* \* \* to establish a definite definition for the word "huaraches" both as to its commercial and its common meaning.

As hereinbefore stated, in that situation, the majority, in order to determine the meaning of the word and to give effect to the intent of the negotiators of the agreement, considered the information contained in the Digests of Trade Data, *supra*.

In its decision in the *Fuchs* case, referring to its decision in the *Weigert-Dagen* case, the majority said:

In that case this court found that the term "huaraches" was ambiguous and also found such a sharp conflict in testimony, even among witnesses called by the same party, *as to conclude that the word possessed no common or commercial meaning.*

It will be seen, therefore, that, in the *Weigert-Dagen* case, the majority of our appellate court concluded that there was a *failure of advisory testimony* to establish a common or commercial meaning for the term (i.e., not that a common or commercial meaning did not exist), whereas, in the *Fuchs* case, the conclusion reached is stated to be that the term possessed no common or commercial meaning.

The matter is important in that the additional evidence offered in this case relates to the common meaning of the term "huaraches," as under-

stood in Mexico and in the United States at and prior to the effective date of the Mexican Trade Agreement in which the term first appeared in a tariff sense. If, of course, the term possessed no common or commercial meaning, but only a technical or a specific meaning in which the negotiators of the trade agreement used it, the evidence in the case at bar would be completely immaterial, as, indeed, would be any evidence other than that which would exhibit in direct fashion what the negotiators had in mind when they used the term "huaraches."

It is conceivable, of course, that negotiators of a trade agreement could use a term, which, defined in advance and which definition was agreed upon by the negotiators, would always mean a certain thing when used in the subsequent agreement. Such a term might, for example, be a coined word or expression which actually would have no meaning in the languages of the signatories to the agreement. We do not think, however, that "huaraches" is such a word. It is a common word in the Mexican language, and, although the witnesses in the *Weigert-Dagen* case could not seem to agree on its meaning, it appears to be a word which is known in the United States. Since it is a word which came to be known in the United States by way of Mexico, and since, presumably, there was a meeting of the minds of the negotiators in their use of the term, it could scarcely be that "huaraches" would mean one thing in Mexico and another thing in the United States.

As was stated by the majority of the court in the *Weigert-Dagen* case—

Agreements between nations should be construed so as to carry out the intention of the contracting parties.

The information contained in the Digests of Trade Data, it would appear, was, possibly, furnished to the negotiators *for the United States*, but there is no evidence that it was furnished to the *Mexican* negotiators, or that, if it was, there was agreement by the Mexican negotiators that the definition of "huaraches" contained in the Digests of Trade Data should govern the interpretation of the agreement.

Accordingly, we do not think that our appellate court intended to be understood as holding that the meaning it adopted for the term was not reflective of the common or commercial meaning thereof. Certainly, in the *Fuchs* case, the matter was presented by both parties and considered by the court on the basis that the issue was *not* whether the definition contained in the Digests of Trade Data represented the only meaning of the term, but, rather, whether the articles there involved were within that definition of the term, assuming it to be correct.

The gist of the evidence offered in the case at bar is not that the definition contained in the Digests of Trade Data is incorrect or wrong, but that the description contained therein applies only to one

kind or type of huarache, and that there are many kinds or types of huaraches which differ in various respects from each other, of which plaintiff's collective exhibits 1 and 2 and defendant's illustrative exhibit D at bar are examples.

Such evidence is acceptable as bearing upon the common meaning of the term "huaraches" for, as pointed out by our appellate court in its decision in the case of *Marshall Field & Co.* v. *United States*, 45 C.C.P.A. (Customs) 72, C.A.D. 676, the common meaning of a tariff term is not necessarily fully and completely determined by the judicial opinion rendered in one case—the process of determining the common meaning of a tariff term is one which may extend over more than one case, the court saying:

\* \* \* Thus, on a case by case basis, the court construes and sets the limits of the statutory language by a process of inclusion and exclusion. It is by this process that we determine "common meaning," \* \* \*.

We think the evidence offered to us is clear, and, moreover, uncontradicted, that the type of huarache described in the definition contained in the Digests of Trade Data is one associated with the place in Mexico called Guadalajara and that such huaraches are known as Oaxaca huaraches. Such a huarache was offered and received in evidence herein as defendant's illustrative exhibit D and is conceded by the parties to be a huarache. (It is interesting to note that, although the toe, or vamp, portion of illustrative exhibit D is wholly woven, it possesses a piece of slitted solid leather acting as a back or counter, through which some of the leather strips from the vamp are laced. The back or counter is not stitched to the sole, but if the back be considered part of the upper, as we assume it must, the upper of illustrative exhibit D is certainly not *wholly* woven.)

The evidence is just as clear and just as uncontradicted that footwear, such as plaintiff's collective exhibits 1 and 2, was, at and prior to the effective date of the Mexican Trade Agreement, commonly known in Mexico and in the United States as huaraches, and more particularly as Mazatlán huaraches, taking their name after the area in Mexico in which they were generally made. We accept such evidence as an aid to our understanding of the common meaning of the tariff term "huaraches."

We think we are justified in saying that had the evidence offered to us in this case been offered in the previous cases, a different conclusion would have been reached as to that portion of the subject merchandise which was of the same kind or type of footwear as is involved in this case, i.e., Mazatlán huaraches.

On the record before us, we hold that the common meaning of the term "huaraches" includes footwear of the kind or type described in the Digests of Trade Data, as set forth in the *Weigert-Dagen* and *Fuchs* cases, *supra*, and also includes footwear of the kind or type of

plaintiff's collective exhibits 1 and 2 in this case, which have been hereinbefore described.

Judgment will, therefore, issue sustaining the protest claim for duty at the rate of 10 per centum ad valorem accordingly.

WILSON, Judge: I regret that I am unable to concur with my colleagues in holding that the facts in the foregoing case are sufficiently different to warrant a holding contrary to the conclusion reached by the appellate court in the cases of *United States* v. *Weigert-Dagen et al.*, 39 C.C.P.A. (Customs) 58, C.A.D. 464, and *United States* v. *Fuchs Shoe Corporation*, 41 C.C.P.A. (Customs) 179, C.A.D. 547. In my opinion, the *Weigert-Dagen* and *Fuchs* cases are controlling in the instant case, and the so-called Mazatlán type footwear here involved is not "huaraches," within the meaning of that term, as used in the Mexican Trade Agreement under consideration, and I would so hold.

The protest should, therefore, be overruled.