(C.D. 2722)

THE DE HAAN COMPANY v. UNITED STATES

United States Customs Court, First Division

(Decided June 28, 1966)

*Stein & Shostak (Marjorie M. Shostak and S. Richard Shostak of counsel)* for the plaintiff.

*John W. Douglas*, Assistant Attorney General (*Sheila N. Ziff*, trial attorney), for the defendant.

Before OLIVER, NICHOLS, and WATSON, Judges; OLIVER, J., concurring

NICHOLS, Judge: The merchandise covered by the protests herein consists of footwear, imported from Mexico during 1944 and 1945. It

was assessed with duty at 20 per centum ad valorem under paragraph 1530(e) of the Tariff Act of 1930, as footwear wholly or in chief value of leather and is claimed to be dutiable at 10 per centum ad valorem under said paragraph, as modified by the trade agreement with Mexico, T.D. 50797, as huaraches.

The pertinent provisions of the tariff act are as follows:

Par. 1530. * * *

*     *     *     *     *     *     *

(e) Boots, shoes, or other footwear (including athletic or sporting boots and shoes), made wholly or in chief value of leather, not specially provided for, 20 per centum ad valorem; * * *.

[Par. 1530(e), as modified by T.D. 50797.] Boots, shoes, or other footwear (including athletic or sporting boots and shoes), made wholly or in chief value of leather, not specially provided for:
> Huaraches_____10% ad valorem

All but one of these protests were filed in 1946 and were suspended on March 31, 1947, under protest 110857–K, decided on appeal February 6, 1961, *United States* v. *A. J. Taylor of Santa Fe, New Mexico*, 48 CCPA 97, C.A.D. 772. Hearings were held in Laredo in February 1963 and March 1964. Protest 63/12105 was filed on March 29, 1963. Some of the protests were severed and the severed protests submitted on a stipulation of counsel that certain styles of the footwear were similar in all material respects to those the subject of the *Taylor* case. *The De Haan Company* v. *United States*, 52 Cust. Ct. 354, Abstract 68563. Plaintiff has abandoned its claims as to certain other items. The cases, as consolidated, were submitted before Judge Wilson on March 13, 1964. Plaintiff's brief was filed on June 28, 1965, and defendant's brief was filed on February 15, 1966.

At issue are the following styles:

| Style numbers | Protest numbers | Exhibit numbers |
|---|---|---|
| 353 | 126837–K, 129194–K, 129197–K 129198–K, 129199–K 129200–K, 63/12105 | Exhibit 1, 129197–K Exhibit 5, 129197–K Exhibit 2, 129199–K |
| 253 | 129194–K, 129200–K | Exhibit 2, 129200–K |
| 232 | 129194–K, 129198–K, 129200–K | Exhibit 3, 129198–K |

Exhibit 1, protest 129197–K, style 353 MC, is a multicolor sandal with the vamp formed of a piece of slitted leather interwoven with flat leather strips of various colors which are laced to the insole on the inside of the slitted leather piece. That piece is stitched to the insole and the outsole by the same stitching that fastens the two soles together. The back counter consists of a slitted piece of leather with a

few flat colored leather strips woven through it. It is stitched to the insole and the outsole. Exhibit 2, protest 129199–K, and exhibit 2, protest 129200–K, are similar except for the color of the leather strips and the design they form. Exhibit 5, protest 129197–K, is similar except that it is entirely natural in color.

Exhibit 3, protest 129198–K, is a multicolor sandal with the vamp formed of two separate widths of slitted leather interwoven with flat leather strips of various colors laced to the insole on the inside of the slitted leather piece. Those pieces are stitched to the insole and the outsole by the same stitching that fastens the two soles together. The back counter is similar to those of the other exhibits. All of these exhibits have heels which have been nailed on.

A number of cases have been before this court and the court of appeals involving footwear claimed to be huaraches. *Weigert-Dagen et al.* v. *United States*, 25 Cust. Ct. 105, C.D. 1272, reversed *United States* v. *Weigert-Dagen et al.*, 39 CCPA 58, C.A.D. 464; *Fuchs Shoe Corporation* v. *United States*, 29 Cust. Ct. 188, C.D. 1466, reversed *United States* v. *Fuchs Shoe Corporation*, 41 CCPA 179, C.A.D. 547; *A. J. Taylor of Santa Fe, New Mexico* v. *United States*, 43 Cust. Ct. 205, C.D. 2128, affirmed *United States* v. *A. J. Taylor of Santa Fe, New Mexico*, 48 CCPA 97, C.A.D. 772.

The starting point in all of the decisions hitherto has been the definition or description found in the Digests of Trade Data issued by the United States Tariff Commission after the signing of the trade agreement with Mexico, which states:

Huaraches are leather-soled sandals having woven-leather uppers laced to the insole. The insole is machine-stitched to the outsole, and the heel is nailed on. They are used principally by women and girls for beach and casual summer wear.

In the *Weigert-Dagen* case, the trial court found that all of the exhibits did not conform to that definition because the uppers were only partly woven, or because the uppers were not laced through the insole, or because the insole was attached to the outsole by other than machine stitching, or because the heel was not nailed on. It concluded that the term "huarache" meant footwear of a type generally worn in Mexico having as its distinguishing feature an upper wholly or substantially woven which was laced to the insole. Some of the articles before it were held to be huaraches and some were not. As to two of the articles, the court said (pp. 112–113).

* * * It should be noted that in exhibits 45 and 46 the uppers consist of solid pieces of leather containing slits through which are woven leather strips which are laced to the insoles. The same stitching which holds the outsole to the insole also passes through the solid leather portion of the upper, so that it is held not only by the tradi-

tional lacing of the huarache but also by a sewing. These exhibits, however, meet all the tests of huaraches, and we do not believe that the extra sewing takes them out of that category. * * *

The court of appeals reversed, stating that the word "huarache" was an ambiguous word; that the evidence as to its meaning was conflicting, and that the definition in the Digests of Trade Data was "the only convincing evidence in the record as to the intent of the contracting parties as to the meaning of the term 'huaraches.'" It held that none of the articles of footwear fell within that meaning.

In the *Fuchs* case it was held that sandals which did not have wholly woven uppers were not huaraches. The appellate court stated (p. 182):

It is to be noted that all of the testimony and other evidence clearly establish that a woven upper is an essential characteristic of huaraches. If the definition were so qualified as to satisfy the contention of the importer, it is not difficult to visualize footwear, the vamp consisting of a solid piece of leather attached to the insole by such a minute degree of weaving as to destroy one of the major characteristics of huaraches and thereby nullify that portion of the definition relating to "woven-leather uppers."

A different result was reached in the *Taylor* case as to merchandise described by the court of appeals as follows (p. 98):

Exhibits 1 and 2 are representative of the imported merchandise. They are identical in construction but differ in size and color combinations. They are both without heels. The toe portion or vamp consists of a piece of slitted leather interwoven with fourteen flat leather thongs which are laced to the insole. The back quarter or counter consists of a slitted piece of leather machine stitched to the insole. Four flat thongs are interlaced into and extend completely around the counter, are interwoven on each side of the shoe with some of the thongs of the vamp, and are laced to the insole. The insole is machine stitched to the outsole. Each exhibit has an instep leather strap and buckle.

There was testimony to the effect that the huarache described in the Digests of Trade Data was a type known as a Oaxaca huarache and that the footwear above described was known as a Mazatlan huarache. The court concluded, two judges dissenting, that the common meaning of the term "huaraches" included footwear of both types, but the court limited its holding to the merchandise before it.

Thus sandals with wholly woven uppers and those with uppers consisting of slitted leather with interwoven leather thongs laced to the insole have been held to be huaraches. From the decisions and the samples which have been stipulated to be huaraches (*The De Haan Company* v. *United States, supra;* exhibit 1, protest 126837–K; exhibit 2, protest 129197–K; exhibit 1, protest 129198–K; exhibits 1, 3, and 4, protest 129199–K; and exhibit 3, protest 129200–K), it appears that

the presence or absence of a heel counter and its construction is not controlling nor is the presence or absence of a heel itself, as long as the heel, when present, is nailed on.

It has been stipulated that the merchandise now before the court consists of women's, misses', and children's shoes from Mexico; that they are leather soled sandals; that the insoles are stitched to the outsoles; and that the heel and the heel counter are immaterial to the classification of the merchandise.

Footwear of the type here involved was held in the *Weigert-Dagen* case not to be huaraches. The question before us now is whether the present record establishes sufficient facts on the basis of which it may be held that such articles do fall within the meaning of the term "huaraches," as used in the trade agreement.

Plaintiff's first witness was J. M. Cortez, sales manager of Mexican Products Co. and credit manager of the Texas Hat Co. He testified that the Mexican Products Co. had imported leather footwear, huaraches, from Mexico from 1932 to 1942 and had sold by mail order to summer resorts in Florida, Georgia, and the West Coast. The witness said that his duties involved the training and supervision of all salesmen in the United States. He was not in charge of manufacturing or buying. Purchasing in Mexico was done by Mr. Mateos De Llano, a partner of the firm, or later by his nephew. Imported leather footwear sometimes came through the witness' hands, but he did not handle the invoices. He had visited Mexico on various occasions in the 1930's and later, on business and on vacation trips. He had seen leather footwear made in Guadalajara and Cuernavaca. He said that such articles were usually made in homes, but there was one factory in Guadalajara making them in mass production. He had also seen them sold in Vera Cruz, Mexico City, and Puebla.

Mr. Cortez testified that, during the period in question, he had dealt with leather footwear daily. He had bought, sold, and dealt with footwear such as the groups of samples stipulated to be huaraches, as huaraches, and by no other name. He had also bought, sold, and dealt in merchandise such as the samples at issue and had sold them as huaraches in the United States. When asked the characteristics of the huaraches his company imported, he stated:

They were the cheap grade, and the ones that men wore, and the ladies. They improved the workmanship in Guadalajara.

He explained:

During the time which we were importing these huaraches, we received a lot of complaints from the trade that they didn't last a month because they were so badly made. The woven strips weren't strong enough, and they suggested being sewed—the manufacturer suggested to sew them, and make them stronger, last more.

He did not think that the improvement took the footwear out of the category of huaraches.

The witness testified that there were differences in quality of workmanship and style depending upon where the shoes were made in Mexico and that the better ones, such as exhibit 1, protest 129197–K, were made in Guadalajara. He had seen merchandise like exhibit 3, protest 129198–K, in Mexico in the 1930's, but his firm did not import that type. He said that exhibit 5, protest 129197–K, number 353 Natural, was made before 1943, but his testimony as to the multicolored ones was conflicting. He stated that wedged style shoes were not huaraches, and mentioned other styles called sandalias huaraches, but he did not describe them. Although his firm had ceased importing huaraches in 1942, he still saw them on the market during the period from 1943 to 1950, and they were still being offered as huaraches.

Plaintiff's second witness was Carlos P. Cantu, who has been a freight forwarder in Laredo, Tex., since 1940. He had never been in the business of buying or selling leather footwear. He testified that, during 1940–50, his clients imported leather footwear and he had become familiar with it through inspecting and handling it for them. While he did not care what the goods were called, if he received "huaraches" and they were called "boots," he would look it up. During the 1940's he had handled several million pairs of Mexican leather shoes, sometimes as many as two railroad cars with 70,000 pairs, and had shipped them to Chicago, New York, Philadelphia, Detroit, San Antonio, Dallas, Houston, San Francisco, and Los Angeles. He went to Mexico several times a year to solicit business from huarache manufacturers and shippers. He had seen leather footwear which he knew as huaraches being manufactured in Guadalajara. Most of the footwear he handled was of the type that originated in Oaxaca; he had handled styles No. 232 and No. 353 only in small quantities. He became familiar with what he knew as a huarache through hearing people in Mexico and in the United States and those to whom he forwarded such articles calling them huaraches. In his understanding, this term referred to the footwear at issue as well as that which was the subject of the stipulated case. He had handled the former only in small quantities. He identified exhibit D from the *Taylor* case as a huarache from Oaxaca and said that the footwear he saw before 1943 was mostly of that type. He had seen style No. 353 and said that it was originally made with the vamp laced into the insole but that later it had been made in Guadalajara where it had been machine stitched on the outside. The reason for the machine stitching was the large demand because of the war. He had also seen other styles called huaraches, "especially for men to work with, very heavy sole, and instead of the upper woven like this, it just had three or four pieces of leather interlaced." He also knew there were other styles from Mazatlan.

Defendant called Joseph L. Kleinman, appraiser of merchandise at El Paso, who has been in the customs service since September 1923 and had testified in the *Taylor* case. He had been involved with the footwear line since 1933. His duties included the examination and inspection of leather footwear and the making of inquiries and surveys with reference to various types of such footwear, including huaraches. He had talked with manufacturers, shippers, importers, and purchasers, and had seen many purchase orders and like papers. On the basis of his experience, he described a huarache as follows:

Well, it is a flat soled type of footwear, leather, with or without a heel. If it has a heel, it is usually nailed on. The main part of the upper, usually called the vamp, is made of narrow strips of leather that are laced into the insole, and go over the tops of the upper, laced to the other side of the insole. Sometimes those leather strips are woven together. Sometimes they are laced through a loose strip of leather that is in the footwear.

In his opinion, exhibit 1, protest 129197–K; exhibit 2, protest 129199–K; exhibit 5, protest 129197–K; and exhibit 2, protest 129200–K, were not huaraches because the solid leather piece through which the strips were laced was also machine stitched to the insole and the outsole and was the main part of the vamp or upper. If the laces in the vamp were to be removed, the solid piece would still remain. He stated that exhibit 3, protest 129198–K, was not a huarache either, because it had two solid pieces forming the main part of the upper which were stitched down to the insole and the outsole. He had never heard of an item with these characteristics called a huarache before 1943, and had never seen such articles before 1943.

On cross-examination, the witness stated that in exhibit 1, protest 129197–K, the same machine stitch that holds the inner sole to the outsole holds it to the vamp as well. Except for the fact that the stitching of the vamp is to the outer sole, he would return it as a huarache under the *Taylor* decision. He said there was nothing about the character of the leather or the workmanship that would tell him that it came from Guadalajara, Cuernavaca, or Oaxaca. He thought it would wear better than the shoes in which the uppers were laced directly to the insole.

Mr. Kleinman testified that occasionally the Mexicans referred to merchandise such as that at issue as huaraches. He said that in Mexico most any kind of an open style footwear was called huaraches by "lots of Mexicans." Most of those which were not returned as huaraches were called sandalias. To his knowledge, American importers did not call this merchandise huaraches, and it was not bought and sold as huaraches, except occasionally. In fact, many items came through the ports which were called huaraches but which bore no relation to any of the articles at issue, such as wedgies.

The witness stated that the lacing of both exhibit 2, protest 129199–K (at issue here) and that of exhibit 2, protest 129193–K (a Mazatlan style huarache) went into the insole. "If this solid piece and the vamp" (R. 31) of the latter were outside and the bottom were extended out and stitched down it would be similar to the former.

It is evident that there is a difference in construction between the Mazatlan huarache and those here involved and that this difference might not be noticed on casual examination (except as to style 232). Plaintiff claims that the footwear herein is basically similar to the Mazatlan huaraches in construction, appearance, shape, and style of vamp, including the narrow strip lacing, and that, therefore, they are classifiable as huaraches. Plaintiff also claims that the negotiators of the Mexican Trade Agreement, in using the term "huaraches," intended to cover most of the women's and children's footwear imported from Mexico. This argument is based on exhaustive analysis of various tariff publications, including the Digests of Trade Data, which states:

Prior to January 1, 1943, huaraches were not reported separately in United States official import statistics but were included among all leather boots and shoes made by processes other than McKay sewed, turn or turned, and welt. *Practically the entire imports from Mexico of women's, misses', children's, and infants' shoes in this category consist of huaraches. * * ***

\*    \*    \*    \*    \*    \*    \*

The production of huaraches has long been a handicraft industry in Mexico. In most localities they are made only in sufficient quantities to fill local needs, but since these sandals have become popular in the United States, a number of sections have increased their output substantially in order to meet the export demand. The more important producing centers are Guadalajara, Oaxaca, Mazatlan, and Cuernavaca. More than 95 percent of the exports of huaraches from Mexico go to the United States. [Emphasis supplied.]

Plaintiff relies on the well-known rule that an *eo nomine* designation in a tariff provision, without terms of limitation and without a shown contrary legislative intent, judicial decision, or administrative practice, will include all forms of the article, citing *Nootka Packing Co. et al.* v. *United States*, 22 CCPA 464, 466, T.D. 47464, and other cases. It is argued that the footwear at issue has all the characteristics of huaraches specified in the description in the Digest of Trade Data, was intended to be covered, and should, therefore, be classified as huaraches, even though it has some variations from the Mazatlan style.

Defendant contends that the merchandise at bar bears a slight resemblance to huaraches, but differs greatly in construction from them and that the record is insufficient to establish that such merchandise was commonly known in the United States and Mexico as huaraches prior to 1943.

The *Taylor* case went off on evidence that both the Oaxaca and the Mazatlan styles of huarache had long been well known in Mexico and traded in by importers. Mr. Taylor himself first purchased the Oaxaca type in 1927 and the Mazatlan type in 1929. The boom in United States importation began about 1934–35, at which time both types became familiar to Mr. Kleinman, the El Paso appraiser, who, somewhat anomalously, testified for the importer in the *Taylor* case. The Czechoslovak shoe industry produced a cheaper "take-off" huarache which damaged the Mexican trade for a while, until Hitler invaded that country, but thereafter the Mexican huarache enjoyed increasing demand climaxing with the civilian shoe shortage and rationing of the World War II period. During the war, huaraches were frequently offered as not subject to rationing.

The State Department published a notice of intent to negotiate a trade agreement with Mexico, April 4, 1942, T.D. 50608. In the Federal Register of April 7, 1942, it also published a list of items to be negotiated, including huaraches. The agreement was signed December 23, 1942, and the President proclaimed it on December 28, the same year.

The definition of a huarache in the Digest of Trade Information (1943) fitted the Oaxaca huarache and not that of Mazatlan, nor that here in issue, but as plaintiff herein rightly argues, other statements in the digest, as quoted, indicate that the trade agreement negotiators thought the word "huarache" as used by them, covered practically all leather footwear from Mexico for women and children, imported at that time, which it could not if the Mazatlan type was excluded. The digest shows it was prepared and published in 1943. It purports on its face to have been "drawn" from "detailed data" made available by the Tariff Commission *"prior to and during* the negotiations with Mexico," and there is, therefore, no way of telling exactly as of what date any statement may be made, nor whether it was even before the United States negotiators in the form published, still less before those who represented Mexico. That nation, as Judge Mollison observed in the *Taylor* case, is certainly entitled to have the benefit of her bargain respecting huaraches, without having the natural meaning of the word limited by an incomplete definition not shown to have been disclosed to her representatives before they signed the agreement.

Plaintiff herein claims its present importations do conform to that definition, but this involves interpreting the definition otherwise than it has been construed hitherto. We do not think plaintiff should be held to this standard and do not do so. The *Taylor* case seems to have accomplished the complete discrediting of the definition at least so far as used to exclude footwear from the concession if not described

therein. It is of no service to us in this case and the defendant herein does not rely on it. This results from peculiar circumstances and does not discredit other proper uses of historical materials in interpreting statutes and trade agreement provisions in which we continue to believe.

This case is the opposite side of the coin from the *Taylor* case, in that the evidence here shows rather clearly, and we find, that the style here involved, with the vamp laced to the insole and also stitched down to the insole with the same stitching that fastens the two soles together, was not known to commerce before 1943. The same appraiser, Mr. Kleinman, whose testimony was so effective for plaintiff in the *Taylor* case, was called by defendant here, and was positive as to this. Plaintiff's two witnesses, Mr. Cortez and Mr. Cantu, did not refute it convincingly. Cantu fixed no specific dates at all. Cortez claimed he saw style 353 Natural, exhibit 5 in protest No. 129197–K, in Mexico before 1943, and also exhibit 3 in protest No. 129198–K, but he seemed uncertain and confused. We note that it cannot be easy for a person, in all good faith, to fix from memory the date of a trade innovation that happened 20 years earlier, without apparent reference to any record or other thing contemporary with the alleged event, to check and refresh his recollection. It is, however, clear from Cortez's testimony that the style was first introduced during the huarache boom because of complaints by United States customers that the styles then imported were not sufficiently durable.

The date the new style appeared can be more nearly approximated from the incorporated record in the *Weigert-Dagen* case. Therein, the exhibits 45 and 46 have the same lacing and stitching of the vamp to the insole that characterize the merchandise at bar. Mr. Dagen, a vice president of the plaintiff-importer, testified (IR 81–82):

THE WITNESS: These are Exhibits 45 and 46.
JUDGE LAWRENCE: And how long have you been familiar with that type of slipper?
THE WITNESS: As long as—you mean made as it is here?
JUDGE LAWRENCE: Yes, for that type.
THE WITNESS: It has been made, actually, as far as I know, only for the past three to four years.

And, to indicate the different age of other styles, the quote is continued without a break—

JUDGE LAWRENCE: * * * Do you know how long huaraches have been a well-known article of commerce in this country?
THE WITNESS: I'd say for the past maybe 15 or 20 years.

This testimony was given on November 26, 1946, and, therefore, the earliest date for introduction of the style would be November 26, 1942.

Mr. William Fuchs testified on May 6, 1947, that his concern, Fuchs

Shoe Corp., was a New York importer and dealt in Mexican huaraches in joint venture with Weigert-Dagen. Counsel asked the witness when his concern commenced handling the various items and the replies for exhibits 45 and 46 were "since the latter part of 1943." Of the numerous trade witnesses, in that case, who were asked about the times they had become acquainted with the various styles there involved, none explicitly connected the type of exhibits 45 and 46 with an earlier year than 1943, though they did so as to other types.

There was much evidence in the *Weigert-Dagen* record that from 1934–35 on, United States buyers frequently had new huarache or so-called huarache styles produced in Mexico to their specifications. There can be no reasonable doubt that the type exemplified by exhibits 45 and 46 in the *Weigert-Dagen* case, and by all the exhibits in the case now at bar, came into being in that manner and never was a traditional huarache style produced by Mexicans for Mexicans. This is not to say that we regard the American origin of the design as a controlling factor.

There was in evidence in the *Weigert-Dagen* case an advertisement of Bloomingdales, exhibit P, of June 3, 1945, offering a shoe "not rationed"—"In Real Leather!" called a "Muchacha." The record reflects a practice of United States sellers offering footwear under different but (to an Anglo-Saxon) similar names when it was not of Mexican origin or not an authentic huarache. The ad includes a picture showing the article was strikingly like the merchandise at bar. The Czechoslovak shoe was advertised in 1939 as: "A take-off of the Mexican huarache." (Exhibit M.) There are also in evidence ads by Joske's of San Antonio, in 1944, of "Mexican-Made Leather Sandals" (exhibit 48) picturing articles strikingly like the merchandise now at bar. The record sufficiently reflects that, after being imported in quantity, and, of course, well after the trade agreement, the articles involved and their like were sometimes called huaraches, but were far from invariably so called.

If, however, the word "huarache" came to be applied to articles not known when the trade agreement was made, it would remain to be determined whether the concession was intended by the parties to apply to such articles.

Of course, the trade agreement was not intended to grant a concession to anything anyone might call a huarache. And it was reasonably foreseeable, without impugning anyone's good faith, that self-interest would urge persons dealing in items of Mexican leather footwear for women and children to call them huaraches when the term could be used with any plausibility. We attach small probative value to what importers themselves call what they import. *Gitkin Co.* v. *United States*, 54 Cust. Ct. 182, C.D. 2530, appeal dismissed December

31, 1965. We presume that the negotiators were aware of the rule of construction we believe to be of universal application, that an exception newly carved out of a previously stated general rule is to be construed strictly. *Goat and Sheepskin Import Co. et al.* v. *United States*, 5 Ct. Cust. Appls. 178, 180, T.D. 34254; *Joleo Impex Co.* v. *United States*, 45 Cust. Ct. 6, 10, C.D. 2189; *Hartford Electric Light Co.* v. *Federal Power Commission*, 131 F. 2d 953, certiorari denied 319 U.S. 741. We have already held that the concession in the Mexican Agreement for men's and boys' footwear does not apply to footwear used indifferently by members of both sexes. *A. Zerkowitz & Co., Inc.* v. *United States*, 54 Cust. Ct. 151, C.D. 2525, appeal dismissed August 14, 1965.

The *Taylor* case treated as controlling the fact that the style of huarache there involved had been known and imported before the date of the trade agreement. We think the logical converse is that the concession does not apply to articles not imported as huaraches, on the date of the agreement, or similar to such articles. This conclusion finds some support in our appellate court's decision in *United States* v. *Tropical Craft Corp., etc.*, 42 CCPA 223, C.A.D. 598, wherein the addition of wedge heels to alpargatas was held to remove them from the reduced rate accorded them in the Argentine Trade Agreement, though the case is not exactly parallel. In a "new case" on similar merchandise, *Tropical Craft Corp.* v. *United States*, 45 CCPA 59, C.A.D. 673, the court reaffirmed its position and held that the word "alpargata" had to be interpreted as of the date of the trade agreement in which it was named.

It is true, as plaintiff says, that a tariff term includes all forms of the article, including those new to commerce since the legislation was enacted. We have recently applied this rule to electric toothbrushes. *Kaysons Import Corp.* v. *United States*, 56 Cust. Ct. 146, C.D. 2622, decided March 2, 1966. But that was an unambiguous term. Here, however, the agreement used a term that was and has remained hopelessly ambiguous, as all courts which have considered it agree. It is necessary to resolve the ambiguity by extrinsic aids to determine what the parties meant. The view adopted in *Taylor*, and herein, is that the parties meant such articles as were dealt in and imported as huaraches at the time of the agreement. The best available extrinsic aid is the undiscredited part of the *Trade Agreement Digest*, *supra*, which rather plainly indicates that the term was meant to cover what was then being imported as huaraches. If this is not the way to construe the agreement, we are unable to perceive the way; the digest definition being discarded, there remains nothing else to prevent anything being a huarache which the importer calls a huarache.

We do not, of course, mean that any slight and immaterial new departure in design takes the article out of the huarache category. Plaintiff argues that the variations herein, from the adjudicated *Taylor* design, are immaterial. We are unable to agree. The evidence showed the stitching of the vamp to the soles had an important purpose, durability. It also makes the shoe stiffer. On the other hand, the change detracts from the ventilation of the true huarache, which must add to its comfort in warm climates. The addition of stitching to lacing of the vamp brings the product a great deal closer to the footwear protected by the higher rate, both in appearance and in function. In reducing the rate on the huarache to 10 percent, the negotiators undoubtedly had in mind that the product was so uniquely characteristic of Mexico that a scrupulous merchant would not advertise a product of another country as a huarache. Conversely, they had in mind a large volume of domestic production with which the true Mexican huarache would not compete. The digest says that the huarache is the product of "handicraft industry" and that "strictly similar merchandise is not produced in the United States." The instant merchandise was made to a United States buyer's specifications and was not native to Mexico; the extent of its competition with United States produced merchandise is not shown in the record but is surely more direct than that of a true huarache.

Finally, the holding of our appellate court respecting exhibits 45 and 46 in the *Weigert-Dagen* case would seem to be authority herein. No like merchandise was adjudicated in the *Taylor* case, and the reasoning of the *Taylor* case, as we have shown, does not impair that part of the *Weigert-Dagen* holding.

There is some evidence to justify the inference that the styles here involved or some of them could have been designed, ordered, and produced between the publication of the notice of intent to negotiate and the proclamation of the agreement. We are of the opinion that the meaning of the word "huarache" is to be fixed as of the time it was first used, in the notice and list of products published on April 7, 1942, as aforesaid. We do not think a change in meaning between that date and the proclamation of the agreement would be fair dealing with the persons to whom the notice was given, unless it is explained as resulting from, e.g., something that transpired at a hearing of the Committee for Reciprocity Information, as to which we now have no evidence. Moreover, the first publication would set in motion the changes in usage due to the self-interest of persons in the trade, which we have already mentioned. However, plaintiff has not proved to our satisfaction that the imported articles, or articles similar in all material respects, actually were produced in Mexico, or imported, at any date before 1943.

The protests are overruled and judgment will be rendered for the defendant.

### CONCURRING OPINION

Oliver, Judge: I wish to state my specific concurrence in the holding reached by my colleague, Judge Nichols, in this case. With the decision of our appellate court in *United States* v. *A. J. Taylor of Santa Fe, New Mexico*, 48 CCPA 97, C.A.D. 772, the law in the case has reached a significant turning with a corresponding change in the nature of plaintiff's burden. That is, while a plaintiff is no longer required to show that his goods fall within the rather narrow confines of the Digest of Trade Data definition for the term "huaraches," it is now incumbent upon him to show, by a convincing weight of the evidence, that the style of Mexican sandal in issue was so known in the trade by 1943 so as to validate the underlying proposition that it was a type of "huarache" known to and traded for by the negotiators of the Mexican Trade Agreement.

From a review of the record in this case, together with the existence of evidence in the incorporated cases concerning the question of the prevalency, before 1943, of huaraches having the upper or vamp section machine stitched to the soles, I find the plaintiff's burden not discharged and I, therefore, concur in overruling the protests.