(C.D. 4284)

MEXICAN AMERICAN IMPORT CO. ET AL *v.* UNITED STATES

United States Customs Court, First Division

(Decided   October 18, 1971)

*Lamb & Lerch* (*Stein & Shostak* and *Marjorie M. Shostak* of counsel) for the plaintiffs.

*L. Patrick Gray, III,* Assistant Attorney General (*Glenn E. Harris, Robert Blanc,* and *Andrew P. Vance,* trial attorneys), for the defendant.

Before WATSON and MALETZ, Judges, and ROSENSTEIN, Senior Judge

ROSENSTEIN, Judge: The merchandise involved in the consolidated protests herein consists of leather footwear imported from Mexico during 1944 and 1945 and assessed with duty at 20 per centum ad valorem as other footwear, made wholly or in chief value of leather, not specially provided for, under paragraph 1530(e), Tariff Act of 1930. Plaintiffs contend that the importations are classifiable under said paragraph as "huaraches" within the meaning of the Trade Agreement with Mexico, T.D. 50797, in force and effect during the period of importation herein, which modified the duty rate on huaraches to 10 per centum ad valorem.[1]

The footwear at issue, of which exhibits 1 through 4 are representative samples, are leather soled sandals with flat leather strips which are woven through slits in the uppers, or vamps, and which lace the vamps to the insoles. The uppers are also machine stitched to the insoles by the same stitching which fastens the insoles to the outsoles. The heel is nailed on.[2]

The meaning of the term huaraches, as used in the trade agreement, and the kinds of footwear it encompasses, have been the subject of litigation in this court for over 20 years. The test cases on this issue, the records in which were incorporated herein, are *Weigert-Dagen et al.* v. *United States,* 25 Cust. Ct. 105, C.D. 1272 (1950), reversed *United States* v. *Weigert-Dagen et al.,* 39 CCPA 58, C.A.D. 464 (1951); *Fuchs Shoe Corporation* v. *United States,* 29 Cust. Ct. 188, C.D. 1466 (1952), reversed *United States* v. *Fuchs Shoe Corporation,* 41 CCPA 179, C.A.D. 547 (1953); *A. J. Taylor of Santa Fe, New Mexico* v. *United States,* 43 Cust. Ct. 205, C.D. 2128 (1959), affirmed *Id.* v. *Id.,* 48 CCPA 97, C.A.D. 772 (1961); *The De Haan Company* v. *United States,* 57 Cust. Ct. 39, C.D. 2722 (1966), affirmed *Id.* v. *Id.,* 55 CCPA 76, C.A.D. 936 (1968).

Although only exhibits 45 and 46 in *Weigert-Dagen* and the merchandise involved in *De Haan* are similar in construction to the footwear at bar in that the uppers are machine stitched as well as laced

---

[1] The pertinent provisions of paragraph 1530(e) are as follows:

(e) Boots, shoes, or other footwear (including athletic or sporting boots and shoes), made wholly or in chief value of leather, not specially provided for, 20 per centum ad valorem; * * *.

[Par. 1530(e), as modified by T.D. 50797.]

Boots, shoes, or other footwear (including athletic or sporting boots and shoes), made wholly or in chief value of leather, not specially provided for:

Huaraches _____ 10% ad valorem

[2] It was stipulated that the heel and heel counter are immaterial to the classification of the merchandise (R. 13).

to the insoles, all of the incorporated cases are pertinent to our understanding and resolution of the issue herein.

The first three cases were summarized by Judge Nichols for the trial court in *De Haan* as follows (57 Cust. Ct. 41–43) :

> The starting point in all of the decisions hitherto has been the definition or description found in the Digests of Trade Data issued by the United States Tariff Commission after the signing of the trade agreement with Mexico, which states :
>
>> Huaraches are leather-soled sandals having woven-leather uppers laced to the insole. The insole is machine-stitched to the outsole, and the heel is nailed on. They are used principally by women and girls for beach and casual summer wear.

In the *Weigert-Dagen* case, the trial court found that all of the exhibits did not conform to that definition because the uppers were only partly woven, or because the uppers were not laced through the insole, or because the insole was attached to the outsole by other than machine stitching, or because the heel was not nailed on. It concluded that the term "huarache" meant footwear of a type generally worn in Mexico having as its distinguishing feature an upper wholly or substantially woven which was laced to the insole. Some of the articles before it were held to be huaraches and some were not. As to two of the articles, the court said (pp. 112–113).

> * * * It should be noted that in exhibits 45 and 46 the uppers consist of solid pieces of leather containing slits through which are woven leather strips which are laced to the insoles. The same stitching which holds the outsole to the insole also passes through the solid leather portion of the upper, so that it is held not only by the traditional lacing of the huarache but also by a sewing. These exhibits, however, meet all the tests of huaraches, and we do not believe that the extra sewing takes them out of that category. * * *

The court of appeals reversed, stating that the word "huarache" was an ambiguous word; that the evidence as to its meaning was conflicting, and that the definition in the Digests of Trade Data was "the only convincing evidence in the record as to the intent of the contracting parties as to the meaning of the term 'huaraches.' " It held that none of the articles of footwear fell within that meaning.

In the *Fuchs* case it was held that sandals which did not have wholly woven uppers were not huaraches. The appellate court stated (p. 182) :

> It is to be noted that all of the testimony and other evidence clearly establish that a woven upper is an essential characteristic of huaraches. If the definition were so qualified as to satisfy the contention of the importer, it is not difficult to vizualize footwear, the vamp consisting of a solid piece of leather attached to the insole by such a minute degree of

weaving as to destroy one of the major characteristics of huaraches and thereby nullify that portion of the definition relating to "woven-leather uppers."

A different result was reached in the *Taylor* case as to merchandise described by the court of appeals as follows (p. 98) :

> Exhibits 1 and 2 are representative of the imported merchandise. They are identical in construction but differ in size and color combinations. They are both without heels. The toe portion or vamp consists of a piece of slitted leather interwoven with fourteen flat leather thongs which are laced to the insole. The back quarter or counter consists of a slitted piece of leather machine stitched to the insole. Four flat thongs are interlaced into and extend completely around the counter, are interwoven on each side of the shoe with some of the thongs of the vamp, and are laced to the insole. The insole is machine stitched to the outsole. Each exhibit has an instep leather strap and buckle.

There was testimony to the effect that the huarache described in the Digests of Trade Data was a type known as a Oaxaca huarache and that the footwear above described was known as a Mazatlan huarache. The court concluded, two judges dissenting, that the common meaning of the term "huaraches" included footwear of both types, but the court limited its holding to the merchandise before it.[3]

Thus sandals with wholly woven uppers and those with uppers consisting of slitted leather with interwoven leather thongs laced to the insole have been held to be huaraches. * * *

In *De Haan*, which involved, as aforenoted, merchandise similar to that at bar, two witnesses appeared for plaintiff and one for the government. Their testimony was reviewed in detail by the court, which concluded (57 Cust. Ct. 48) :

> This case is the opposite side of the coin from the *Taylor* case, in that the evidence here shows rather clearly, and we find, that the

---

[3] The court of appeals in *Taylor* also quoted approvingly the trial court's statement (43 Cust. Ct. 210) that—

We think the evidence offered to us is clear, and, moreover, uncontradicted, that the type of huarache described in the definition contained in the Digests of Trade Data is one associated with the place in Mexico called Guadalajara and that such huaraches are known as Oaxaca huaraches. Such a huarache was offered and received in evidence herein as defendant's illustrative exhibit D and is conceded by the parties to be a huarache. * * *

> \*　　　\*　　　\*　　　\*　　　\*　　　\*

The evidence is just as clear and just as uncontradicted that footwear, such as plaintiff's collective exhibits 1 and 2, was, at and prior to the effective date of the Mexican Trade Agreement, commonly known in Mexico and in the United States as huaraches, and more particularly as Mazatlán huaraches, taking their name after the area in Mexico in which they were generally made. We accept such evidence as an aid to our understanding of the common meaning of the tariff term "huaraches."

We think we are justified in saying that had the evidence offered to us in this case been offered in the previous cases, a different conclusion would have been reached as to that portion of the subject merchandise which was of the same kind or type of footwear as is involved in this case, i.e., Mazatlán huaraches.

style here involved, with the vamp laced to the insole and also stitched down to the insole with the same stitching that fastens the two soles together, was not known to commerce before 1943. The same appraiser, Mr. Kleinman, whose testimony was so effective for plaintiff in the *Taylor* case, was called by defendant here, and was positive as to this. Plaintiff's two witnesses, Mr. Cortez and Mr. Cantu, did not refute it convincingly. Cantu fixed no specific dates at all. Cortez claimed he saw style 353 Natural, exhibit 5 in protest No. 129197–K, in Mexico before 1943, and also exhibit 3 in protest No. 129198–K, but he seemed uncertain and confused. We note that it cannot be easy for a person, in all good faith, to fix from memory the date of a trade innovation that happened 20 years earlier, without apparent reference to any record or other thing contemporary with the alleged event, to check and refresh his recollection. It is, however, clear from Cortez's testimony that the style was first introduced during the huarache boom because of complaints by United States customers that the styles then imported were not sufficiently durable.

The court also referred to the testimony in the incorporated *Weigert-Dagen* case, particularly with respect to exhibits 45 and 46 therein, noting (page 49) :

> There was much evidence in the *Weigert-Dagen* record that from 1934–35 on, United States buyers frequently had new huarache or so-called huarache styles produced in Mexico to their specifications. There can be no reasonable doubt that the type exemplified by exhibits 45 and 46 in the *Weigert-Dagen* case, and by all the exhibits in the case now at bar, came into being in that manner and never was a traditional huarache style produced by Mexicans for Mexicans. This is not to say that we regard the American origin of the design as a controlling factor.

and held that plaintiff had not proved that the imported articles, or articles similar in all material respects, actually were produced in Mexico, or imported, at any date before 1943.

The appellate tribunal affirmed, stating (55 CCPA 84–85) :

> * * * The record is convincing that huaraches on the date of the trade agreement were hand-laced to the sole while the instant merchandise has the vamps machine-stitched to the soles, and that the vamp of huaraches is structurally dependent on the woven laces, since they are the only connection of the vamp to the soles, while here the lacing forms only a minor portion of the vamp, consisting of wide solid pieces of leather stitched to the insole with lacing inserted largely for decorative effect.
>
> \*     \*     \*     \*     \*     \*     \*
>
> While we agree with appellant that the trade negotiators intended to include footwear "commonly-known" as huaraches within the embrace of the Mexican Trade Agreement, we are not persuaded that the appellant has borne the burden incumbent upon it to establish that the imported merchandise was so known and embraced.

The question before us, as plaintiffs note in their brief, is whether they have "now established, by the additional evidence adduced herein, that the particular style of leather footwear at issue here, with the vamp laced and also stitched to the sole, was known and imported into the United States as huaraches on and prior to the date of the Mexican Trade Agreement."

Plaintiffs' sole witness, Manual Aguilar Figueroa, a Guadalajara merchant who had manufactured some of the footwear at bar, testified that he had made footwear having a vamp like exhibit 1 for home consumption in the 1920's, and for export to the United States in about 1934 or 1935; that this style, like exhibit D in the *A. J. Taylor* case, was known as a huarache; and that most of his export items were shipped through Laredo. He began to deal with the De Haan Company in about 1936, which ordered just one or two styles from a complete set of samples furnished its representative. After 1943 he made a style similar to exhibit 1 for De Haan. The Oaxaca style was first copied and manufactured in Guadalajara in 1939 and 1940. From 1940 to 1945 Aguilar represented a trade association of footwear manufacturers and exporters. He could not remember if he had sold footwear similar to exhibit 1 to Weigert-Dagen; he had "sold most of my shoes to the De Haan Import Corporation" (R. 69). The witness, who was 75 years old, testified without the aid of invoices or other records (except for the invoices in the protests at bar), relying solely on his memory.

Eziquiel Ruiz Gomez, a purchasing agent during 1942 for A. J. Taylor, testified that he had purchased huaraches similar in construction to exhibit D in the incorporated *A. J. Taylor* case for Taylor, and that footwear like exhibit 1 at bar was referred to in Oaxaca stores as "sandals".

Joseph L. Kleinman, former appraiser of merchandise at El Paso, who had appeared for plaintiff in the *Taylor* case and for defendant in *De Haan*, testified that he did not recall seeing footwear similar to exhibits 1 through 4 enter the port of El Paso prior to 1943, and that, in his opinion, these articles were not huaraches. The principal importer of huaraches at El Paso was A. J. Taylor who purchased mostly the Oaxacan and Mazatlán styles. He could not recall whether Taylor had ever imported footwear having a vamp construction similar to exhibits 1 through 4.

Plaintiffs claim that this record establishes that the subject footwear was known and dealt in as "Guadalajaran" style huaraches in the trade and commerce of Mexico and exported to the United States "long prior to the negotiation of the Mexican Trade Agreement". These articles, they assert, were shipped through Laredo and thus were unfamiliar to Kleinman, whose experience was limited to the styles,

principally Oaxacan and Mazatlán, which were imported at El Paso.

To support this, plaintiffs cite statistics compiled and published by the Tariff Commission and the Bureau of the Census which show that, from 1943 through 1946, imports of huaraches at Laredo far exceeded in volume those at all other ports combined. They also refer to the statement in the Digests of Trade Data, 1943, published by the Tariff Commission in connection with the Presidential proclamation relating to the Mexican Trade Agreement, that "The more important producing centers are Guadalajara, Oaxaca, Mazatlán, and Cuernavaca."

We are unable to agree. Upon careful consideration of the incorporated records and the record herein, we find that plaintiffs have not discharged their burden of establishing that footwear like that at bar, with the vamp machine stitched and laced to the insole, was dealt in and imported as huaraches at the time the trade agreement was being negotiated.

At the first hearing in the *Weigert-Dagen* case, in November 1946, Irwin Dagen, vice president of the plaintiff-importer, who purchased footwear in Guadalajara, Oaxaca, Mazatlán, and other cities in Mexico for export to the United States, testified, with respect to footwear represented by exhibits 45 and 46 (which also had vamps laced and machine stitched to the insoles), that they had been made, as far as he knew, "only for the past three to four years".

William Fuchs, president of Fuchs Shoe Corporation, whose major sources of supply for Mexican footwear were Oaxaca, Cuernavaca, Mazatlán, Guadalajara and Mexico City, and who had purchased jointly with Weigert-Dagen one quarter million pairs in 1941, one-half million in 1942 and one million each in 1943 and 1944, stated that he had purchased articles like exhibits 45 and 46 "since the latter part of 1943".

The *Weigert-Dagen* record also includes the testimony of F. A. Sherwood, who had been in business in Guadalajara as an "exporter of Mexican huaraches" since 1935. The witness, who was called by plaintiffs at the October 1948 hearing, testified that he frequently visited the homes and factories in Guadalajara where they were made and that he was also familiar with the types originating in other cities, such as Mazatlán, Cuernavaca and Oaxaca, as samples of footwear from those places were submitted to him for copying.

The witness identified the various types of footwear in issue, noting that certain styles, which had originated in one locale, were now copied elsewhere. Thus, the Mazatlán and Oaxacan styles were copied in Guadalajara, and the "Roman" style (Inc. exhibits 5, 6 and 10) was first manufactured there in 1939. He described the "Peineton" (Inc. exhibit 17) and the "Leon" (similar to Inc. exhibits 33, 34, and 35)

footwear as Guadalajaran styles. Sherwood stated that exhibits 45 and 46 were house slippers "of the huarache type" (Inc. R. 425) which were made in Guadalajara, but he did not identify them as styles in which he had dealt prior to 1943 or which were indigenous to that area, as noted in the following exchanges:

Q. You spoke of the Leon type similar to certain exhibits here, which you started to export back in the 30's. Were there any other types which you handled prior to 1943 which are similar to any of these exhibits?—A. Well, the Popotillo, I don't see there. That huarache is very popular. We mentioned the Leon type before as being the first type shipped in any quantity.

Q. Is there a type that you might refer to as an Oxford or not?—A. There was what was called the Choclo huarache, which just means Oxford huarache. That was made in the latter part of '35. I had some orders on that. Fred Layton was the buyer. [Inc. R. 425.]

\* \* \* \* \* \* \*

Q. Any other types that you recall which you have handled prior to 1943 which are similar to the exhibits on the table?—A. I handled the Roman type, and certain of those Mazatlan types.

Q. Perhaps you better mention the exhibits in detail which you referred to prior to 1943. I show you Exhibits 5, 6, and 10. Is that what you mean by the Roman type?—A. Yes.

Q. What others?—A. Some similar to Exhibit 22, but I would say the design was different.

Q. What do you mean by "similar"?—A. I mean similar construction. [Inc. R. 426.]

\* \* \* \* \* \* \*

XQ. How many types of huaraches did you find in Guadalajara when you went there in 1935 being made?—A. There was the Leon type, the Popotillo type, the Choclo type. [Inc. R. 432.]

\* \* \* \* \* \* \*

XQ. You mentioned three types of huaraches that you found in Guadalajara when you commenced in '35. Is that about all?—A. There may have been others. There was a similar type to the Leon—I recall it now—made in Ciudad Guzman. They had their own particular special name for it, which I don't recall at this moment. [Inc. R. 433.]

In summary, the evidence in the incorporated records does not support plaintiffs' claim that the merchandise at bar is a pre-1943 "Guadalajaran" huarache;[4] and the testimony herein of the witness Aguilar, unsupported by invoices or other documents and far removed in time from the events in issue, does not suffice to overcome the negative effect of those records or to discharge plaintiffs' burden.

---

[4] The trial court, in *De Haan*, observed of the *Weigert-Dagen* record that (p. 49): Of the numerous trade witnesses, in that case, who were asked about the times they had become acquainted with the various styles there involved, none explicitly connected the type of exhibits 45 and 46 with an earlier year than 1943, though they did so as to other types.

Plaintiffs also contend that the subject footwear is similar in all essential characteristics to the Mazatlán style sandals held in the *Taylor* case to be huaraches and subsequently so stipulated by the government.

This argument, which was also raised in *De Haan*, was disposed of by the appellate court as follows (55 CCPA 84–85):

> Appellant contends here, as it did below, that the merchandise under consideration does not differ in material aspects from the styles adjudicated as huaraches in the *Taylor* case. In our view the relevant exhibits and the Kleinman testimony clearly refute this contention. The record is convincing that huaraches on the date of the trade agreement were hand-laced to the sole while the instant merchandise has the vamps machine-stitched to the soles and that the vamp of huaraches is structurally dependent on the woven laces, since they are the only connection of the vamp to the soles, while here the lacing forms only a minor portion of the vamp consisting of wide solid pieces of leather stitched to the insole with lacing inserted largely for decorative effect.

> Pertinent in this connection, with ample support of record, is the observation of the Customs Court that:

>> The evidence showed the stitching of the vamp to the soles had an important purpose, durability. It also makes the shoe stiffer. On the other hand, the change detracts from the ventilation of the true huarache, which must add to its comfort in warm climates. The addition of stitching to lacing of the vamp brings the product a great deal closer to the footwear protected by the higher rate, both in appearance and in function. In reducing the rate on the huarache to 10 percent, the negotiators undoubtedly had in mind that the product was so uniquely characteristic of Mexico that a scrupulous merchant would not advertise a product of another country as a huarache. Conversely, they had in mind a large volume of domestic production with which the true Mexican huarache would not compete. The digest says that the huarache is the product of "handicraft industry" and that "strictly similar merchandise is not produced in the United States." The instant merchandise was made to a United States buyer's specifications and was not native to Mexico; the extent of its competition with United States produced merchandise is not shown in the record but is surely more direct than that of a true huarache.

>> \*    \*    \*    \*    \*    \*    \*

> We consider it significant that the *Digests of Trade Data*, the press release of December 23, 1942, as well as the 1946 *Digest* and the 1948 *Summaries* describe merchandise substantially different from the merchandise at bar. These publications state that huaraches have uppers laced to the insole and that the insole is machine-stitched to the outsole. The record is devoid of a single publication describing huaraches which have vamps machine-stitched to the insole.

There is nothing of record herein which persuades us to depart from the prior holding of our court of appeals.

The protests are overruled and judgment will be entered accordingly.